

**Joseph Brown**
Partner
Direct Dial: 716.848.1346
Direct Facsimile: 716.849.0349
*jsbrown@hodgsonruss.com*

May 7, 2018

**VIA ECF**

Chambers of the Hon. Judith C. McCarthy
United States Magistrate Judge
United States District Court, Southern District of New York
The Hon. Charles L. Brieant Jr.
Federal Building and United States Courthouse
300 Quarropas St.
White Plains, NY 10601-4150

Dear Magistrate Judge McCarthy:

      Re:    Claudia Barbini and Maryetta Henry v. First Niagara Bank, et al.
             Civil Action No:  16-CV-7887

      I am submitting this letter on behalf of Defendants KeyBank National Association (incorrectly referenced as "Key Bank N.A." in the caption), successor by merger to First Niagara Bank, N.A. ("First Niagara"), Irina Damyanidu, and Robert McMichael (collectively, the "Bank" for this letter). The Bank submits this letter and the attached Declaration of Lura Bechtel, attached as **Exhibit A**, in support of its motion for a protective over to preclude the plaintiffs from asking questions about legal advice that Ms. Bechtel provided as the Bank's in-house legal counsel.

      The attorney-client privilege issue at the crux of this motion first arose during the April 26, 2018 deposition of Defendant McMichael, a Human Resources Manager for the Bank. Relevant excerpts from the transcript of McMichael's deposition are attached as **Exhibit B**. During his deposition, counsel for the parties contacted Your Honor via telephone concerning the applicability of the attorney-client privilege to Mr. McMichael and other Bank employees as it relates to this lawsuit. Your Honor asked that the Bank's counsel brief the issue via letter motion. Below is a brief synopsis of this case and the communications at issue followed by the legal analysis supporting the Bank's motion for a protective order.

Hon. Judith C. McCarthy
May 7, 2018
Page 2

## **BACKGROUND**

This is an employment discrimination and retaliation suit brought by two former employees, Plaintiffs Claudia Barbini and Maryetta Henry, who were terminated from their employment at the Bank on or around September 9, 2015.

A number of employees at the Bank are notaries and are therefore required to follow the New York Notary Public License Law and the Bank's notary public policy.  The Bank's policy states, in pertinent part:  "The person requesting the notary service ***must be physically present in front of you*** and sign the document prior to applying the notary stamp to the document." (emphasis added).

In her position as Assistant Branch Manager, Plaintiff Claudia Barbini was also a licensed notary, and she notarized documents for customers and at the request of management at both branches.  As a Senior Teller, Plaintiff Maryetta Henry was also a licensed notary.  She notarized documents for customers and at the request of the management at the Vassar Branch.

In or around September 2015, Area Manager Irina Damyanidu discovered that notaries at Plaintiffs' branches may have been improperly notarizing documents in violation of Bank policy.  An investigation revealed that Henry and Barbini had been notarizing documents without the customer being present.  It was also determined that Defendant Hugh Lawless, former Branch Manager, knew about the practice and participated in obtaining customer signatures and presenting the document to a notary without the customer present.

The crux of this case is Plaintiffs' retaliation claim.  Plaintiff Henry reported that on or about August 14, 2015, Lawless sent Henry and another employee, a text message with a link to an inappropriate website.  The Bank immediately investigated the incident after Henry reported the matter.  The Bank issued a final written warning to Defendant Lawless the following week.

### A. Privileged Communications Regarding the Investigation and Final Written Warning to Lawless

Mr. McMichael was the HR representative assigned to investigate Plaintiff Henry's claim concerning the text message from Lawless.  As the result of Mr. McMichael's investigation, the Bank placed Defendant Lawless on final written warning.

At deposition, Mr. Michael testified that he had communications with Lawless' Area Manager, Irina Damyanidu, and the Bank's in house legal counsel, Lura Bechtel, Esq, concerning the decision to place Lawless on a final written warning. Ex. B. Tr. 49-50.  The Bank's counsel objected to the questions that sought to elicit testimony regarding McMichael's specific discussions with Bechtel.  *See id.* Tr. 50, 109-118.

As explained in the accompany declaration of Lura Bechtel, she was employed as the Bank's in-house employment attorney and regularly provided legal advice on employment

Hon. Judith C. McCarthy
May 7, 2018
Page 3

matters. Bechtel Decl., ¶¶ 4-6. Any communications that Attorney Bechtel had with Robert McMichael or others at the Bank regarding the Bank's decisions to issue a final written warning to Lawless were solely for the purpose of providing legal advice on behalf of the Bank. *Id.* at ¶ 9. This is not a situation where Attorney Bechtel was in a business role and merely happened to hold a law degree. She was the Bank's in-house employment attorney.

## B. Privileged Communications Regarding the Termination of Lawless and Plaintiffs

In his testimony, McMichael indicated Marlys Regina, also in the Bank's HR Department, "may" have sought Attorney Bechtel's advice regarding the Bank's decision on whether or not to terminate Lawless and Plaintiffs. Ex. B, Tr. 114-15. He did not have any communications with Attorney Bechtel regarding termination, and he had no direct knowledge of whether or not Ms. Regina had such communications with Attorney Bechtel or any other attorney regarding the bank notary policy. *Id.* at 115-117.

In or around September 2015, Attorney Bechtel "may have been asked by Marlys Regina (Kotyuk), Human Resources Manager, to provide legal advice regarding the termination of Lawless and Plaintiffs Maryetta Henry and Claudia Barbini." Bechtel Decl., ¶ 8.

Ms. Regina has not been deposed in this action, however, the parties have discussed the possibility of arranging for her video conference deposition in early June 2018 – prior to the cutoff for fact depositions.

## ANALYSIS

The decision in *Anderson v. E. CT Health Network, Inc.*, No. 3:12CV785 RNC, 2014 WL 109115 (D. Conn. Jan. 10, 2014) provides a good overview of the applicable Second Circuit law in this area:

> [t]he attorney-client privilege protects confidential communications between client and counsel made for the purpose of obtaining or providing legal assistance.... [W]e construe the privilege narrowly because it renders relevant information undiscoverable; we apply it "only where necessary to achieve its purpose." The burden of establishing the applicability of the privilege rests with the party invoking it.
>
> *In re County of Erie*, 473 F.3d 413, 418–19 (2d Cir.2007) (citations omitted). "A party invoking the attorney-client privilege must show (1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *Id*. at 419. The party invoking a privilege bears the burden of establishing all of the elements. *See United States v. Int'l Bhd. of*

Hon. Judith C. McCarthy
May 7, 2018
Page 4

> *Teamsters, Chauffeurs, Warehousemen and Helpers of Am., AFL–CIO*, 119 F.3d 210, 214 (2d Cir. 1997).

*Id.* at *2.

Here, McMichael and Regina sought Attorney Bechtel's **legal** advice on employment matters and all such communications were intended to be confidential. As noted by the court in *Anderson*, "[t]he issue of whether a confidential communication between client and counsel is generated for the purpose of obtaining or providing legal assistance often arises in the context of communications with corporate in-house lawyers who also serve as business executives." *Id.* at 3. But this is not a case where the in-house attorney was also providing business advice. Attorney Becthel was clearly an in-house employment attorney whose function was to provide legal advice to Human Resource managers. She was not wearing a "business hat" for the Bank. These facts demonstrate that the predominant feature of any communications with Attorney Bechtel was to provide and obtain legal advice. *See id.* (citing *Lolonga–Gedeon v. Child & Family Services*, No. 1:08CV300A(F), 2012 WL 1714914, at *4 (W.D.N.Y. May 15, 2012) (attorney-client privilege protected pre-termination communications between executive and outside counsel regarding how to avoid being accused of employment discrimination in event defendant decided to terminate plaintiff's employment); *Boudreau v. Gonzalez*, No. 3:04CV1471(PCD), 2006 WL 3462655, at *4 (D.Conn. Nov. 29, 2006) (attorney-client privilege protected pre-termination communications between employer and outside counsel who was retained to provide legal advice to regarding employee's accusation of harassment); *cf. Ashkinazi v. Sapir*, No. 1:02CV002(RCC)(MHD), 2003 WL 76986, at *1 (S.D.N.Y. Jan. 09, 2003) (attorney-client privilege protected pre-termination communications between defendant and in-house counsel regarding legal implications of plaintiff's accusations of misconduct and contract dispute but not counsel's business assessment of plaintiff's performance)).

Based on the foregoing, the Court should issue a protective order finding that any communications that Attorney Bechtel may have had with Marlys Regina, Robert McMichael, or others at the Bank regarding the Bank's decisions to issue a final written warning to Lawless and the terminations of Lawless and Plaintiffs were solely for the purpose of providing legal advice on behalf of the Bank, and that Plaintiffs are therefore prohibited from asking about such communications during depositions.

Respectfully submitted,

s/Joseph S. Brown

Joseph S. Brown

cc:  Brooke Dana Youngwirth, Esq.
     Deidra Jenerva Brown, Esq.
     Melissa Cohen, Esq.
     (via ECF)

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____
CLAUDIA BARBINI and MARYETTA HENRY,
                                        Plaintiffs,

v.                                                      Civil No.:  16-CV-7887-NSR-JCM

FIRST NIAGARA BANK, N.A., KEY BANK N.A. as
successor in interest to First Niagara Bank N.A., et al.,
                                        Defendants.
_____

## DECLARATION OF LURA H. BECHTEL

**LURA H. BECHTEL**, under the penalties of perjury and pursuant to 28 U.S.C. §

1746, declares the following to be true and correct:

1.       I was previously employed as an attorney by Defendant KeyBank National

Association (incorrectly referenced as "Key Bank N.A." in the caption) successor by merger to

First Niagara Bank, N.A. ("First Niagara") (collectively, the "Bank" for purposes of this motion).

I submit this declaration in support of the Bank's motion for a protective order.

2.       I earned a B.S., Industrial and Labor Relations from Cornell University,

and a J.D. from St. John's University School of Law.   I was admitted to the New York bar in

2004 and continue to be an attorney in good standing.

3.       I joined Hodgson Russ in 2005 as an associate attorney in the Labor &

Employment Group, where I advised employers on a broad range of labor and employment

matters.

4.       In May 2011, I joined First Niagara as First Vice President, Assistant

General Counsel.  My job duties included enterprise-wide management of lawsuits and

investigations, including discovery and eDiscovery; providing employment law expertise,

counseling, and compliance support on enterprise-wide basis including compensation (executive and broad-based), employee benefits design & administration, and payroll.

5. After First Niagara's merger with KeyBank, I continued to perform the same functions listed above as Senior Vice President, Senior Counsel for KeyBank. I returned to Hodgson Russ in May 2017 as a partner in the Labor & Employment Group.

6. In the course of my in-house employment attorney duties at the Bank, I regularly provided legal advice to Human Resource managers on various personnel decisions.

7. In or around August 2015, I was asked by the Bank's Human Resources Manager, Robert McMichael, for legal advice about the Bank's decision to issue a final written warning to former Branch Manager, Hugh Lawless.

8. In or around September 2015, I may have been asked by Marlys Regina (Kotyuk), Human Resources Manager, to provide legal advice regarding the termination of Lawless and Plaintiffs Maryetta Henry and Claudia Barbini.

9. Any communications that I had with Regina, McMichael, or others at the Bank regarding the Bank's decisions to issue a final written warning to Lawless and the terminations of Lawless and Plaintiffs were solely for the purpose of providing legal advice on behalf of the Bank. Any such communications were intended to be confidential.

Dated: May 7, 2018

                        s/Lura H. Bechtel
                        Lura H. Bechtel

# Exhibit B

**COPY**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------X

CLAUDIA BARBINI and MARYETTA HENRY,

                    Plaintiffs,

    - against -

KEY BANK, N.A., as successor in interest to
FIRST NIAGARA BANK, N.A., FIRST NIAGARA BANK,
N.A., IRINA DAMYANIDU, in her official and
individual capacities, ROBERT McMICHAEL, in
his official and individual capacities and
HUGH LAWLESS in his official and individual
capacities,

                    Defendants.
-------------------------------------------X

April 26, 2018
10:00 a.m. - 1:40 p.m.
Poughkeepsie, New York


Marianne Glum, Reporter




DEPOSITION

OF

ROBERT McMICHAEL



Mary T. Babiarz Court Reporting, Inc.
845-471-2511

McMICHAEL

A.     She was uncomfortable with
Mr. Lawless and him remaining the branch
manager.  She was just uncomfortable.

Q.     What was the nature of her
discomfort?

A.     That she was aware now that he
accessed those websites.

Q.     Did she say anything else?

A.     I'm thinking of our
conversation.  You know, I asked her to
provide some more details around comfort.
And she had said she just wasn't sure how
he would be looking at her now knowing that
he accessed those type of sites.

Q.     Going back briefly to your
decision to issue a final warning, you
mentioned that you discussed it internally
with your team and you indicated that
in-house counsel was one of the team
members you spoke with.

A.     Yes.

Q.     Who did you speak with in the
in-house counsel office?

A.     Lura Bechtel.

50

                              McMICHAEL

1

2   Q.      Who else was on the team?

3   A.      Irina.

4   Q.      Anyone else?

5   A.      No, no one else.

6   Q.      Between the three of you, you

7   discussed it in-house and came to the

8   conclusion that you should issue a final

9   warning?

10  A.      Yes.

11  Q.      Was that Ms. Bechtel's

12  perspective on it based on your discussions

13  with her?

14          BY MR. BROWN:  Objection on the

15      basis of attorney-client privilege.

16      You don't have to answer that.

17          BY MS. BROWN:  I'm sorry,

18      Ms. Bechtel was in-house counsel.

19          BY MR. BROWN:  Yes.

20          BY MS. BROWN:  I'm not sure

21      that the privilege attaches in these

22      proceedings.  She's not representing

23      him in these proceedings.  I'll leave

24      it alone.

25  Q.      After your conversation with

Case 7:16-cv-07887-NSR-JCM Document 47 Filed 05/07/18 Page 5 of 25

51

McMICHAEL

1
2   your team, there was a decision to issue a
3   final warning.  Was everyone on your team
4   in agreement with that?
5        A.    Yes, after the conversation.
6        Q.    And the reason that everybody
7   was in agreement was because you talked
8   about Hugh Lawless being a new branch
9   manager; was that one of the reasons, in
10   part?
11        BY MR. BROWN:  Objection.  You
12     can answer.
13  BY THE WITNESS:
14       A.    In part.  That was part of the
15   conversation, yes.
16  BY MS. BROWN:
17       Q.    What were some of the other
18   reasons given for issuing a final warning
19   in lieu of termination?
20       A.    Again, related to the concerns
21   that we had with him as being a manager,
22   that was him being new, just him being new
23   to First Niagara.  In relation to the text
24   message, it was, you know, you asked other
25   factors, intent.  It was noted several

1                          McMICHAEL
2       wanted to terminate Mr. Lawless?
3              A.      Yes.
4              Q.      And you were aware of that at
5       the time you consulted with your team?
6              A.      Yes.
7              Q.      What did Ms. Bechtel tell you
8       with regard to the sexual harassment
9       allegations against Mr. Lawless?
10                    BY MR. BROWN:  And at that
11              point I am objecting on the basis of
12              attorney-client privilege and
13              instructing Mr. McMichael not to
14              answer that question.
15                    BY MS. BROWN:  Off the record
16              for just a moment.
17
18                    (OFF THE RECORD DISCUSSION)
19
20                    BY MS. BROWN:  Counsel has just
21              had a discussion off the record with
22              regard to Judge McCarthy's
23              instructions.  It is Mr. Brown's
24              understanding that Mr. McMichael is
25              not to answer the questions but that

McMICHAEL

1
2      I am simply to pose the questions.
3      We will abide by that understanding.
4      Q.      On approximately how many
5  occasions did you meet with Lura Bechtel or
6  discuss the sexual harassment investigation
7  with her?
8              BY MS. BROWN:  You can answer
9          that.  The fact that you met with
10          her, that in and of itself is not
11          privileged.  The substance of what
12          you talked is what I am objecting to.
13          So don't put that out there.
14  BY THE WITNESS:
15      A.      At least once, maybe twice.
16  BY MS. BROWN:
17      Q.      Did you meet with her in
18  person?
19      A.      By phone.
20      Q.      Were there any emails exchanged
21  between you and Ms. Bechtel?
22      A.      I do not believe so.
23      Q.      I am talking now with regard to
24  emails about the sexual harassment
25  investigation.

111

McMICHAEL

1
2     A.    Yes.

3     Q.    Did you provide Ms. Bechtel
4 with a copy of the report or the case
5 details in connection with the sexual
6 harassment investigation?

7     A.    I don't recall if I had
8 provided her report.  There is a way to add
9 her to the system, but I'm not sure if she
10 was added to the system or not.

11     Q.    I'm asking now, before you made
12 the decision to issue the final warning to
13 Mr. Lawless, which would have been in or
14 about August 17th, 18th of 2015, at that
15 time when you spoke to Ms. Bechtel, had she
16 read the case details which are marked as
17 Plaintiff Henry Exhibit 4 for
18 identification?

19     A.    I'm not sure.

20     BY MR. BROWN:  Objection to the
21    form.

22 BY THE WITNESS:

23     A.    I'm not sure.

24 BY MS. BROWN:

25     Q.    Had you provided her with a

112

1                    McMICHAEL

2        copy of those details by that time?

3             A.    I'm not sure.

4             Q.    What information did you tell

5        Ms. Bechtel about the ongoing sexual

6        harassment investigation?

7                    BY MR. BROWN:  Objection on

8             attorney-client privilege.

9        BY MS. BROWN:

10            Q.    Were you present when

11       Ms. Damyanidu spoke with Ms. Bechtel about

12       the sexual harassment investigation?

13            A.    Yes.

14            Q.    What information did

15       Ms. Damyanidu tell Ms. Bechtel about the

16       sexual harassment investigation?

17                   BY MR. BROWN:  Objection on the

18            basis of attorney-client privilege.

19       BY MS. BROWN:

20            Q.    With regard to the choice

21       between issuing a final warning and

22       terminating Mr. Lawless, what did

23       Ms. Bechtel tell you about those two

24       choices?

25                   BY MR. BROWN:  Objection on the

McMICHAEL

1
2     basis of attorney-client privilege.
3   BY MS. BROWN:
4     Q.     Did she advise you as to
5   whether one option was better than the
6   other?
7               BY MR. BROWN:  Objection on the
8       basis of attorney-client privilege.
9   BY MS. BROWN:
10    Q.     Did she give you any advice
11  with regard to whether terminating
12  Mr. Lawless would or would not comply with
13  employment law?
14              BY MR. BROWN:  Objection.
15      Attorney-client privilege.
16  BY MS. BROWN:
17    Q.     When you spoke with
18  Ms. Bechtel, did she give you advice with
19  regard to whether Mr. Lawless's activity
20  constituted a violation of First Niagara's
21  sexual harassment policy?
22              BY MR. BROWN:  Objection.
23      Attorney-client privilege.
24  BY MS. BROWN:
25    Q.     You testified earlier that it

114

McMICHAEL

1
2 was your practice to consult with
3 Ms. Bechtel on matters of employee
4 misconduct; is that a fair statement?
5        A.     At times, yes, I would consult
6 with her, yes.
7        Q.     You consulted with her in
8 connection with the sexual harassment
9 investigation against Mr. Lawless, you've
10 already testified to that, so that's
11 accurate, correct?
12        A.     Yes.
13        Q.     You also mentioned that Marlys
14 Kotyuk Regina, who is a member of your
15 team, also consults regularly with
16 Ms. Bechtel?
17        A.     Yes.
18        Q.     And it's fair to say that
19 Ms. Kotyuk Regina is the human resources
20 manager who investigated the notary issue?
21        A.     Yes.  Who participated in the
22 investigation, yes.
23        Q.     She works for you?
24        A.     She does.
25        Q.     You testified that she had a

Case 7:16-cv-07887-NSR-JCM Document 40-7 Filed 05/06/18 Page 19 of 22
Case 7:16-cv-07887-NSR-JCM Document 47-2 Filed 05/09/18 Page 12 of 15

115

                         McMICHAEL

1  team that she consulted with regard to

2  Ms. Henry and Ms. Barbini and Mr. Lawless

3  should be terminated in the wake of the

4  notary investigation, correct?

5       A.     Correct.

6       Q.     You testified that Ms. Bechtel

7  was part of her team as well?

8       A.     I testified she may have been

9  part of their team.

10      Q.     Do you have any independent

11 knowledge of what Ms. Bechtel may or may

12 not have advised Ms. Kotyuk Regina with

13 regard to the notary policy?

14           BY MR. BROWN:  Objection on the

15           grounds of attorney-client privilege.

16 BY MS. BROWN:

17      Q.     Have you ever spoken with

18 Ms. Bechtel about the notary laws in the

19 State of New York?

20           BY MR. BROWN:  Objection.

21           Attorney-client privilege.  Actually,

22           you know what, I am going to withdraw

23           that objection.

24           BY MS. BROWN:  I don't think

116

                              McMICHAEL

1
2          that's attorney-client privilege.
3                    BY MR. BROWN:  I am going to
4          withdraw that objection.  You can
5          answer that question.
6    BY MS. BROWN:
7          Q.     Have you spoken with
8    Ms. Bechtel about New York State notary
9    law?
10         A.     I have not.
11         Q.     Have you sought her advice with
12   regard to whether or not New York State
13   requires the notary to have the signatory
14   in front of them when they affix their
15   notary stamp to official documents?
16         A.     I have not.
17         Q.     Have you discussed with
18   Ms. Bechtel the bank's zero tolerance
19   policy with regard to notarial misconduct?
20         A.     I have not.
21                   BY MS. BROWN:  Thank you.
22   EXAMINATION BY
23   MS. YOUNGWIRTH:
24         Q.     Do you know whether anyone at
25   First Niagara spoke with Ms. Bechtel or any

117

McMICHAEL

1

2      other attorney regarding the interpretation

3      of First Niagara's notary policy?

4          A.      I am not aware.

5          Q.      Is that that you don't know or

6      you are not aware?

7          A.      I am not aware.

8          Q.      Do you know whether or not

9      anyone at First Niagara consulted with

10     either Ms. Bechtel or another attorney

11     prior to terminating Ms. Henry and

12     Ms. Barbini?

13         A.      I'm not aware.

14         Q.      Do you know who would know

15     that?

16         A.      Marlys Regina would know.

17         Q.      Do you know whether anyone ever

18     gave Ms. Bechtel a copy of the text message

19     that Hugh sent to Maryetta Henry?

20         A.      I don't recall if she was

21     provided a copy.

22         Q.      Is there anything that would

23     refresh your recollection as to whether or

24     not she was?

25         A.      If there is an email exchange

118

1                      McMICHAEL

2   or an email forwarded to Ms. Bechtel it

3   would.

4              BY MS. BROWN:  I have a

5         question.

6   EXAMINATION BY

7   MS. BROWN:

8         Q.    When you spoke with Ms. Bechtel

9   about the issue of issuing a final warning

10  versus termination, did Ms. Bechtel tell

11  you that it would be preferable for you to

12  issue a final warning?

13             BY MR. BROWN:  Objection on the

14        basis of attorney-client privilege.

15             BY MS. YOUNGWIRTH:  I guess we

16        will switch now back over to regular

17        questions.

18  EXAMINATION BY

19  MS. YOUNGWIRTH:

20        Q.    Since Barbini's and Ms. Henry's

21  terminations, have you been involved in any

22  investigations with regard to other

23  employees that have allegedly violated the

24  notary policy?

25        A.    No.