UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CLAUDIA BARBINI and MARYETTA HENRY,

                        Plaintiffs,

        -against-

FIRST NIAGARA BANK N.A., KEYBANK N.A.,
*as successor in interest to FIRST NIAGARA BANK,
N.A.*, IRINA DAMYANIDU, *in her official and
individual capacities*, ROBERT MCMICHAEL, *in
his official and individual capacities*, and HUGH
LAWLESS, *in his official and individual capacities*,

                        Defendants.

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: __03/03/2022__

No. 16 Civ. 7887 (NSR)
AMENDED OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

Plaintiffs Claudia Barbini and Maryetta Henry (collectively, "Plaintiffs") commenced this action against their former employer, KeyBank N.A., successor by merger to First Niagara Bank N.A. (the "Bank"), and former co-workers Irina Damyanidu, Robert McMichael, and Hugh Lawless (collectively, "Defendants"), alleging claims of discrimination, hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 603(a) *et. seq.*, and New York Executive Law § 296 *et seq.* (hereinafter, "New York State Human Rights Law" or "NYSHRL"). Defendants moved for summary judgment against all of Plaintiffs' claims ("Motion," ECF No. 139). For the following reasons, the Court GRANTS IN PART, DENIES IN PART Defendants' motion.

## BACKGROUND

The facts herein are drawn from Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Defs.' SUMF", ECF No. 141), Plaintiffs' Counterstatement of

Disputed Material Facts Pursuant to Local Rule 56.1 ("Pls.' CSUMF", ECF No. 144), the parties' declarations, exhibits, and affidavits, and are undisputed except as indicated.

## I.    Factual Background

### A.    *Undisputed Facts Concerning the Parties.*

Plaintiffs worked together at the Bank's branch located in Vassar, New York.[1] Barbini also worked at one of the Bank's smaller branches located in Pleasant Valley, New York.[2] Both branches were jointly managed by the same branch manager.[3] Barbini worked at the Bank and its predecessor entities, Marine Midland and HSBC, for 27 years from July 5, 1988 until her termination on September 9, 2015.[4] At the time of her termination, Barbini was sixty-six years old and held the position of Assistant Branch Manager.[5] Henry joined the Bank in 2013 as a Teller.[6] The Bank later promoted Henry on 2014 to Senior Teller, the same position she held until her termination on September 9, 2015.[7] Plaintiffs were both notaries licensed in the State of New York and performed notarial services for the Bank's customers.[8]

In December 2014, the Bank promoted Defendant Damyanidu to the position of Area Manager, in which she was responsible for overseeing fifteen of the Bank's branches, including the Vassar and Pleasant Valley branches where Plaintiffs worked.[9] Sometime between January

---

[1] (Defs.' SUMF ¶ 1; Pls.' CSUMF ¶ 1.)

[2] (Defs.' SUMF ¶ 2; Pls.' CSUMF ¶ 2.)

[3] (Defs.' SUMF ¶ 3; Pls.' CSUMF ¶ 3.)

[4] (Defs.' SUMF ¶ 1; Pls.' CSUMF ¶ 1.)

[5] (Defs.' SUMF ¶ 4; Pls.' CSUMF ¶¶ 4, 153.)

[6] (Defs.' SUMF ¶ 5; Pls.' CSUMF ¶ 5).

[7] (Defs.' SUMF ¶ 5; Pls.' CSUMF ¶ 5.)

[8] (Defs.' SUMF ¶ 6; Pls.' CSUMF ¶ 6.)

[9] (Barbini Aff. ¶ 9, ECF No. 145-1; Defs.' SUMF ¶ 7.)

and March 2015, Plaintiffs' Branch Manager—Diana Stile—left her position and Defendant Lawless was hired as an Assistant Branch Manager.[10] In the months that followed, between April and May 2015, Damyanidu made Barbini the Acting Branch Manager of the Vassar and Pleasant Valley branches until she promoted Lawless to Branch Manager.[11]

  B.  *Disputed Facts Concerning the Customer Complaint Against Barbini.*

  Damyanidu avers that she received a customer complaint against Barbini in June 2015.[12] The complaint related that in December 2014, Barbini tried to convince a customer and her husband to submit a home equity application and that she asked them to provide their driver's licenses numbers so that she could update their information on the Bank's system.[13] The customer reported that she and her husband provided Barbini with their driver license numbers, but that they left understanding that Barbini would not process the home equity application after they informed her that they were not interested.[14] The customer later learned that her home had undergone a drive-by appraisal, which indicated that Barbini had submitted the home equity application without

---

[10] The record is unclear as to when these events occurred, and the parties fail to provide conclusive evidence of the same. For example, Defendants contradict themselves first by claiming that Lawless was hired in March 2015, but then later claim that when Stile left in January 2015, Lawless was already an Assistant Branch Manager with Barbini. *(Compare* Defs.' SUMF ¶ 9 *with id.* ¶10.) On the other hand, Plaintiffs claim Stile left in March 2015 after Lawless was hired that same month. (*See* Pls.' CSUMF ¶ 9.)

[11] The record is also unclear as to when these events occurred, and the parties fail to provide conclusive evidence of the same. For example, Plaintiffs first claim that Lawless was promoted in April, but then they contradict themselves later by claiming it occurred in May. (*Compare* Barbini Dep. Tr. at 78:21–79:12, ECF No. 145-5 *with* Pls.' CSUMF ¶ 9; *see also* Am. Compl. ¶ 36, ECF No. 26 (In March 2015, . . . DAMYANIDU, hired a new Assistant Branch Manager, Hugh LAWLESS, to work at the Pleasant Valley and Vassar Branches. Defendant LAWLESS was promoted to Branch Manager of the Pleasant Valley and Vassar Branches by the end of the month.").) On the other hand, Defendants claim that Lawless was promoted about three to four months after he was initially hired. (*See* Damyanidu Dep. Tr. at 11:22–12:11 (Aug. 13, 2019), ECF No. 145-7; Lawless Dep. Tr. at 46:5–10, ECF No. 145-9)

[12] (Damyanidu Aff. ¶ 4, ECF No. 142-1.)

[13] (*Id.*)

[14] (*Id.*)

the customer's approval.[15] The customer also later learned, around May 2015, that Barbini had failed to update the driver's license numbers on the Bank's system.[16] The customer subsequently complained to Damyanidu about Barbini's conduct and the customer severed her relationship with the Bank.[17]

Upon receiving the customer complaint, Damyanidu discussed it with Human Resources ("HR"), who in turn directed her to discuss it with Barbini.[18] Damyanidu met with Barbini, notified her of the complaint, and reminded her that she must obtain customer approval prior to submitting a home equity application.[19] Damyanidu also reinforced that Barbini violated the Bank's procedures and that she could be subject to discipline, although Damyanidu declined to do so.[20]

Barbini denies that the alleged customer complaint ever occurred.[21] She indicates that Lawless testified that it was *he* who received the customer complaint.[22] Barbini does not dispute that Damyanidu met with her regarding the alleged customer complaint, although she states that Damyanidu and Lawless met with her on July 30, 2015, not June.[23] Barbini also claims that at the meeting, Damyanidu could not provide the name of the alleged complaining customer despite purportedly speaking with her over the phone for forty-five minutes immediately prior.[24] Barbini

---

[15] (*Id.*)

[16] (*Id.*)

[17] (*Id.* ¶¶ 4–5.)

[18] (*Id.* ¶ 5.)

[19] (*Id.* ¶¶ 4–5.)

[20] (*Id.*)

[21] (Barbini Aff. ¶¶ 34–35.)

[22] (*Id.* ¶¶ 42; Lawless Dep. Tr. at 203:1–15.)

[23] (Barbini Dep. Tr. at 96:3–98:6.)

[24] (*Id.*)

avers that after Lawless told her the name of the alleged complaining customer the next morning, she told him her side of the story: she withdrew the application after several phone conversations with the customer and that the customer "was not upset with [her]."[25] Barbini further claims that another employee—Jennifer Torner—corroborated that she had the customer's consent to submit the home equity application, contrary to what Lawless and Damyanidu assert.[26]

### C.    *Disputed Facts Concerning Henry's Inappropriate and Unprofessional Behavior.*

Damyanidu testified that during a visit to the Vassar Branch in the summer of 2015, she noticed Henry making inappropriate hand gestures following a staff meeting led by Lawless.[27] Damyanidu shared her observation and concern with Lawless and asked him about Henry's job performance.[28] Damyanidu claims Lawless told her that there had been instances in which Henry

---

[25] (Barbini Dep. Tr. at 110:8–111:21.) In their CSUMF, Plaintiffs claim Barbini testified that she spoke with the customer the day after Lawless and Damyanidu reprimanded her (July 31, 2015) and that the customer told her that she was not upset with her. (*See* Pls.' CSUMF ¶ 18.) However, the Court is of the view that Barbini's deposition testimony is unclear as to when Barbini purportedly learned that the customer was not upset with her:

> A. And I told [Lawless] my side of the story. Husband and wife were at my desk, and we had a very nice conversation. And she confided in me that she had to help her son and gave him money. As she heard my situation with my son, and told her I used my home equity and suggest the same for this --- for her. And she was on board. The husband was hesitating, but she proceeded to give me the information. The customer received the first mailing, and she called me and told me that the husband did not want the line on the house. I tried to explain what the line was and was happy to see her credit score so high. The problem was solved, but they did not want to pay the annual fee. I called again and offered to waive it, but she said no. At that point, I withdrew the application.
> Q. We'll move on to Page 6 of Exhibit 6. This is a continuation of your entry for July 30th, 2015, correct?
> A. Yes.
> Q. Continue.
> A. *I spoke with the customer after that*, and she was not upset with me. I searched the customer profile and I did not lure the customer from the drive-up. They had a problem with the account and I opened a new checking account that day.

(Barbini Dep. Tr. at 110:20– 111:25 (emphasis added). *See also* Barbini Aff. ¶ 41 ("*Prior to withdrawing the application*, *I spoke to . . . the wife*, and she confirmed to me that she was not upset with me and that I had their consent to submit the loan. (emphasis added).)

[26] (Barbini Dep. Tr. at 111:19–112:7.)

[27] (Damyanidu Dep. Tr. at 102:15–103:21; 105:5–13 (April 25,2018), ECF No. 145-6.)

[28] (*Id.* at 103:4–21.)

had behaved unprofessionally, for which Damyanidu suggested they should speak with Henry about her behavior.[29] Although the next step in the Bank's standard process for addressing such behavior was to draft a warning for HR's review, at no point did Damyanidu or Lawless discipline Henry.[30]

Henry denies ever acting improperly or unprofessionally towards Lawless.[31] She does not dispute that neither Damyanidu nor Lawless ever disciplined her for any alleged improper or unprofessional behavior.[32]

D.     *Undisputed Facts Concerning Lawless's Improper Texts to Henry.*

On Friday, August 14, 2015, Lawless sent Henry and another employee, Nazibe Kaba, three text messages that were supposedly intended for his wife.[33] The first text message contained a link to an adult website, kink.com (the "Website"). The two texts that followed included a password and username for the Website.[34] Kaba swiftly responded with texts to Lawless that (i) asked what the Website was and (ii) noted that the Bank restricted her from accessing it.[35] Lawless, who had been on route to the Vassar Branch, claims to have immediately realized that he had

---

[29] (*Id.*)

[30] (*Id.* at 102:15–103:25; 104:16–105:4.)

[31] (Henry Aff. ¶ 44, ECF No. 145-1.)

[32] (Pls.' CSUMF ¶ 31.)

[33] (Defs.' SUMF ¶ 33; Pls.' CSUMF ¶ 33.)

[34] (Defs.' SUMF ¶ 34; Pls.' CSUMF ¶ 34.)

[35] (Defs.' SUMF ¶ 35; Pls.' CSUMF ¶ 35.)

mistakenly sent the text messages to Kaba and Henry instead of to his wife, and quickly responded, "Delete that."[36] At no point did Henry access the Website.[37]

E.    *Disputed Facts Concerning the Events Subsequent to the Improper Texts.*

Lawless testified that upon arriving at the Vassar Branch a short while later, he approached Kaba and Henry, who were standing next to each other, and asked them again to delete the text messages.[38] While Kaba responded that she did delete the texts, Henry said that she would not.[39] Lawless responded that he was embarrassed and that he did not intend the text messages for Henry and Kaba.[40] He told Kaba to ask Henry to delete the text message, and then left the Vassar Branch to call Damyanidu to notify her of what had occurred.[41] He claims that Damyanidu told him things would have to run their course and that he should go back inside and finish the day, which he did.[42]

Henry testified that when Lawless "barged" into the Vassar Branch, he only approached her because Kaba was out on her lunch break.[43] Lawless demanded she give him her phone, delete the texts he sent, and show him that she deleted them, which she refused.[44] Henry testified that

---

[36] (Defs.' SUMF ¶ 36; Pls.' CSUMF ¶ 36.)

[37] (Defs.' SUMF ¶ 37; Pls.' CSUMF ¶ 37.)

[38] (Lawless Dep. Tr. at 63:2–64:10.)

[39] (*Id.* at 64:11–24.)

[40] (*Id.* at 64:6–8.)

[41] (*Id.* at 64:25–65:10.)

[42] (*Id.* at 72:22–72:5.)

[43] (Henry Dep. Tr. at 37:19–38:9, ECF No. 145-4.)

[44] (*Id.* at 38:18–39:8.)

Lawless said he was embarrassed and that he did not mean the texts to go to her.[45] Lawless wanted to speak with her alone but she refused to do so.[46]

> F.    Undisputed Facts Concerning Henry's Call to the Ethics Hotline & Investigation.

By the time Lawless returned to the Vassar Branch after his call with Damyanidu, Henry had already told Barbini about the incident with Lawless and his requests that she delete the text messages.[47] Barbini advised Henry to call the Bank's Ethics Hotline to report the incident, which she did that same day.[48]

The following Monday, on August 17, 2015, the Bank's HR Director, Defendant McMichael, sent Damyanidu an email notifying her of Henry's call to the Hotline.[49] Shortly after Damyanidu arrived at the Vassar Branch, she met with Henry to discuss the incident with Lawless.[50] At Henry's request, Barbini was present for the meeting with Damyanidu.[51] Henry described the incident to Damyanidu, who assured her that the Bank took the situation very seriously and would investigate the issue and take appropriate action.[52] Damyanidu further advised that, in the event that Henry felt uncomfortable to continue working at the Vassar Branch, the Bank could arrange for her to work at its nearby Pleasant Valley Branch.[53]

---

[45] (*Id.* at 39:9–22.)

[46] (*Id.*)

[47] (Defs.' SUMF ¶ 44; Pls.' CSUMF ¶ 44.)

[48] (Defs.' SUMF ¶ 45; Pls.' CSUMF ¶ 45.)

[49] (Defs.' SUMF ¶ 47; Pls.' CSUMF ¶ 47.)

[50] (Defs.' SUMF ¶ 48; Pls.' CSUMF ¶ 48.)

[51] (Defs.' SUMF ¶ 49; Pls.' CSUMF ¶ 49.)

[52] (Defs.' SUMF ¶ 50; Pls.' CSUMF ¶ 50.)

[53] (Defs.' SUMF ¶ 51; Pls.' CSUMF ¶ 51.)

McMichael promptly arranged to meet with and interview Henry over the phone the following day, Tuesday, August 18, 2015, regarding the incident.[54] Barbini accompanied Henry to the meeting with McMichael.[55] Henry described the entire incident to McMichael and told him about other aspects of Lawless's behavior as a manager.[56] She told him Lawless behaved inappropriately as a "closed doors manager" and was not very communicative with the staff.[57] Henry told McMichael that she was "no longer comfortable with how [her] manager looks at [her] knowing that he views porn."[58] McMichael concluded the interview telling Henry that he would continue his investigation and encouraged her to contact him in the event she recalled anything else she forgot to mention.[59]

The following day, Henry sent McMichael an email saying that she had "never experienced such tension between teammates as there ha[d] been since [Lawless] came on board" because Lawless compared employees based on performance by complementing some employees in view of others.[60]

After concluding his investigation, McMichael relayed the information to Damyanidu and Lura Bechtel, the Bank's in-house counsel, to discuss the Bank's next steps.[61] Damyanidu advised McMichael of her view that the Bank should terminate Lawless for his conduct because she felt it

---

[54] (Defs.' SUMF ¶ 53; Pls.' CSUMF ¶ 53.)

[55] (Defs.' SUMF ¶ 54; Pls.' CSUMF ¶ 54.)

[56] (Henry Dep. Tr. at 67:14–68:69:5; McMichael Dep. Tr. at 47:2–9, ECF No. 145-8.)

[57] (Henry Dep. Tr. at 67:14–68:69:5; McMichael Dep. Tr. at 47:2–9.)

[58] (Henry Dep. Tr. at 71:23–72:11.)

[59] (*Id.* at 72:19–72:23.)

[60] (*Id.* at 74:2–75:1.)

[61] (McMichael Dep. Tr. at 49:16–50:10.)

was "very inappropriate what he did."[62] She also mentioned that Lawless "was not conducting himself appropriately as manager" because he was not greeting customers, kept behind closed doors, and was not functioning appropriately as a branch manager.[63] But after further discussion, the three-person team concluded that McMichael should only issue Lawless a final warning.[64] They rested their decision on Lawless being new to the Bank, the investigation revealing that the text messages were accidental and non-intentional, and Henry confirming there was no other related behavior in the past.[65] On August 20, 2015, Damyanidu and McMichael issued the written final warning to Lawless.[66]

### G.    Undisputed Facts Concerning the Bank's Notary Policy.

To ensure the validity and enforceability of loan documents, the Bank insists that its officers and employees adhere to and comply with not only the New York Notary Public License Law, but also the Bank's Notary Policy, which provided, *inter alia*, that "[t]he person requesting the notary service must be physically present in front of you and sign the document prior to applying the notary stamp to the document."[67]

### H.    Disputed Facts Concerning the Bank's Notary Policy.

Defendants claim that the Bank published its Notary Policy via (i) its intranet website, which included a link to the New York Notary Public License Law; and (ii) a link in a weekly

---

[62] (Damyanidu Dep. Tr. at 73:22–74:11, 76:6–19 (April 25, 2018); McMichael Dep. Tr. at 46:11–25.)

[63] (McMichael Dep. Tr. at 46:11–25.)

[64] (*Id.* at 50:25–51:5.)

[65] (*Id.* at 51:6–52:8.)

[66] (Defs.' SUMF ¶ 66; Pls.' CSUMF ¶ 66.)

[67] (Defs.' SUMF ¶ 68; Pls.' CSUMF ¶ 68.)

circular.[68] They also claim that any violation of the Bank's Notary Policy typically resulted in the termination of the offending employee, although there is no explicit policy providing the same.[69]

Plaintiffs dispute that the Notary Policy was readily available in the intranet website, as such website only contained procedures such a how to process "certain types of checks" or transactions that were "not everyday transaction."[70] They also point out that the weekly circulars to which Defendants refer are dated 2014, and that they do not recall ever seeing the Notary Policy until their termination.[71] They further indicate that the Bank has not terminated all employees alleged to have violated the Notary Policy, such as Stephen Mehlman (or "Mailman") in 2013 and Robert Robustelli in 2016.[72]

I.    *Undisputed Facts Concerning Barbini's August 21, 2015 Meeting with Damyanidu.*

On August 21, 2015, Barbini met with Damyanidu.[73] During the meeting, Barbini told Damyanidu about how she had refused a request from Lawless to notarize a home equity loan document that omitted the middle initial of the name of a customer.[74] Lawless told Barbini that he would visit the customer at his home to obtain the middle initial for her to notarize the document afterwards on a Friday night.[75] Barbini refused to do so because she would work on Saturday and

---

[68] (Damyanidu Dep. Tr.  at 131:13–132:6; 135:3–20 (April 25, 2018).

[69] (Damyanidu Dep. Tr.  at 147:9–25, 151:13–15 (April 25, 2018); McMichael Dep. Tr. at 17:25–19:10, 95:18–24; Regina Dep. Tr. at 38:23–39:14, ECF No. 145-11; Bechtel Dep. Tr. at 132:15–133:22, ECF No. 145-12.)

[70] (Henry Dep. Tr. at 19:5–24.)

[71] (*Id.* at 83:8–84:15; Barbini Dep. Tr. at 48:8–16, 52:14–25.)

[72] (Damyanidu Dep. Tr. at 157:23–158:25 (April 25, 2018); Regina Dep. Tr. at 122:22–14. 4–25.)

[73] (Damyanidu Dep. Tr. at 89:4–13 (April 25, 2018); Barbini Dep. Tr. at 136:20–23.)

[74] (Damyanidu Dep. Tr. at 89:14–90:11 (April 25, 2018); Barbini Dep. Tr. at 138:14–140:10.)

[75] (Damyanidu Dep. Tr. at 89:14–90:11 (April 25, 2018); Barbini Dep. Tr. at 139:21–140:15.)

the customer could come in that day so that she could notarize with him in person—which she did and closed on the loan.[76] Damyanidu directed Barbini not to notarize the loan even though Barbini had already refused to do so.[77]

>    J.    *Disputed Facts Concerning the Investigation into Plaintiffs' Alleged Violations of the Notary Policy.*

After the meeting, Damyanidu claims to have contacted Lawless to (i) advise him of her conversation with Barbini; and (ii) note that obtaining a customer signature outside the presence of a notary was unacceptable.[78] Later that day, in the evening, Damyanidu claims Lawless called her again to tell her he witnessed Henry notarizing documents at the end of the day when the branch was already closed.[79] Recognizing Henry's alleged conduct as a violation of the Notary Policy, Damyanidu immediately contacted HR to (i) express her concern about the notary practices at the Vassar Branch; and (ii) commence an investigation of the same.[80]

According to Damyanidu, Marlys Regina (the HR Manager) enlisted Thomas Fee, the Bank's Vice President, Security, to investigate the notary practices at the Vassar branch.[81] Damyanidu then sent Fee and HR an email summarizing the allegations that led her to request an investigation.[82] Fee proceeded to interview (i) Barbini; (ii) Henry; (iii) Robert Robustelli (a Personal Financial Associate at the Vassar Branch who supposedly had knowledge of Henry's

---

[76] (Barbini Dep. Tr. at 138:14–140:10.)

[77] (Damyanidu Dep. Tr. at 93:12–18 (April 25, 2018); Barbini Dep. Tr. at 145:5–7.)

[78] (Damyanidu Dep. Tr. at 95:23–21 (April 25, 2018).)

[79] (*Id.* at 96:22–97:9; Lawless Dep. Tr. at 131:5–10, 134:25–135:21, 137:4–10.)

[80] (Damyanidu Dep. Tr. at 101:17–102:3 (April 25, 2018).)

[81] (*Id.* at 106:9–107:13.)

[82] (*Id.* at 108:11–23; Fee Dep. Tr. at 18:11–20:12, ECF No. 145-13; Regina Dep. Tr. at 135:11–7; Joint Pls.' Counsel Affs., Ex. Y, ECF No. 145-26.)

notarial practices); and (iv) Zuzana Cepko, an Assistant Branch Manager at the Pleasant Valley Branch.[83]

During his meeting with Barbini, Fee testified that she said Lawless had requested her to notarize two loans without the customer present.[84] Barbini told him that she refused to notarize one of them, but that she notarized the other one without the customer present because Lawless had secured the customer's signature at her home due to a broken leg.[85] Relatedly, during his own deposition, Lawless testified that he purportedly had instructed Barbini to return to the customer's home with a blank signature page in order to (i) have the loan documents re-signed in Barbini's presence; and (ii) have Barbini notarize the documents there.[86] He claims to have chosen Barbini "[b]ecause she knew the customer" and she was headed towards the Pleasant Valley branch, which was nearby the customer's home.[87]

Fee interviewed Henry twice.[88] He testified that during the first interview, Henry initially denied any improper activity concerning the notarization of any documents.[89] Fee then interviewed Robustelli, who reported that Henry had once notarized a loan document outside the presence of a customer days after the customer had signed the documents.[90] Robustelli told Fee that Henry had notarized the customer's signature at his request on August 21, 2015, two days after the customer

---

[83] (Fee Dep. Tr. at 28:2–9; Joint Pls.' Counsel Affs., Ex. AA, ECF No. 145-28.)

[84] (Fee Dep. Tr. at 35:4–23.)

[85] (*Id.* at 36:7–20, 38:3–39:2; Joint Pls.' Counsel Affs., Ex. AA.)

[86] (Lawless Dep. Tr. at 115:3–116:13; 121:15–124:7; 128:6–129:9.)

[87] (*Id.* at 121:20–123:9.)

[88] (Fee Dep. Tr. at 43:8–20.)

[89] (*Id.*)

[90] (*Id.* at 44:16–45:13; Robustelli Dep. Tr. 53:23–54:18, ECF No. 145-10.)

had signed.[91] After interviewing Robustelli, Fee reviewed several hours of video recorded on August 21, 2015, by the Bank's security cameras of the Vassar Branch, which he claims confirmed Robustelli's claims.[92] Fee recalled Henry and conducted a second interview, during which she purportedly admitted to notarizing the customer's signature two days after the customer had signed the documents and to also notarizing a second loan in violation of the Bank's Notary Policy.[93]

After concluding his interviews, Fee related the following findings in his report: (i) Barbini admitted notarizing a loan outside the presence of the customer; (ii) Lawless requested that Barbini notarize the two loans outside the presence of those customers; and (iii) Henry admitted to notarizing two loans outside the presence of the customers.[94] On September 3, 2015, Damyanidu and Regina received Fee's report.[95]

Plaintiffs dispute several aspects of Fee and Defendants' accounts. They first indicate that Damyanidu, not Regina, enlisted Fee to investigate the notary practices because (1) Regina denied ever contacting Fee to investigate the matter and (2) Fee testified that Damyanidu contacted him first.[96] Barbini denies ever admitting to notarizing a loan without the customer present.[97]  Henry also disputes Fee's account of the two interviews he conducted. Henry testified that during the first interview, she admitted to signing a loan document outside the presence of the customer only a

---

[91] (Joint Pls.' Counsel Affs., Ex. AA.)

[92] (Fee Dep. Tr. 47:22–51–24.)

[93] (Fee Dep. Tr. at 43:3–20, 46:5–9; Joint Pls.' Counsel Affs., Ex. AA.)

[94] (Joint Pls.' Counsel Affs., Ex. AA.)

[95] (Damyanidu Dep. Tr. at 162:4–163:15; Regina Dep. Tr. at 11:6–8; 101:21–102:9; 136:8–11.)

[96] (Fee Dep. Tr. at 20:13–21:2; Regina Dep. Tr. at 113:4–9.)

[97] (Barbini Aff. ¶¶ 67–78 (Aug. 3, 2020); *but see* Barbini Dep. Tr. at 156:23–157:4, 198:15–21 (May 3, 2018) (testifying that she "reported" to Fee and Damyanidu notarizing a loan without the customer being present).)

few hours after the customer had left the Bank.[98] But that during the second interview, Fee accused her of lying because he watched video footage showing her notarizing the loan two days after the customer had signed.[99] Henry said she did not remember that and that she did not lie; she told him her understanding of what happened to the best of her recollection because it had been a busy summer.[100] Fee then asked her if there were other documents in which she did the same, to which she replied she "believed there was one other" by the name of D'Armento.[101] Plaintiffs finally point out that Fee sent a draft of his report to Damyanidu asking for corrections and additions *before* sending the finalized version to her and Regina.[102]

### K.    *Undisputed Facts Concerning Plaintiffs' Termination.*

Regina and Damyanidu discussed Fee's Report.[103] Although Lawless was not a notary, the Bank accepted Fee's finding that, as Branch Manager, Lawless improperly had requested that Barbini notarize two loans outside the customers' presence.[104] After reviewing the report, Regina forwarded it to McMichael, noting her view that Fee's findings supported terminations for Barbini, Henry, and Lawless.[105] Although Regina had the authority to terminate employees for such conduct, HR managers like herself typically notified McMichael prior to terminating multiple

---

[98] (Henry Dep. Tr. at 88:17–89:19.)

[99] (*Id.* at 90:12–91:11.)

[100] (*Id.*)

[101] (*Id.* at 91:12–21.)

[102] (Joint Pls.' Counsel Affs., Ex. BB.)

[103] (Defs.' SUMF ¶ 110.) Under Local Civil Rule 56.1, the Court construes Plaintiffs' failure to specifically controvert the correspondingly numbered paragraph in Defendants.' SUMF as an admission of the same.

[104] (Defs.' SUMF ¶ 112.) Under Local Civil Rule 56.1, the Court construes Plaintiffs' failure to specifically controvert the correspondingly numbered paragraph in Defendants.' SUMF as an admission of the same.

[105] (Defs.' SUMF ¶ 108.) Under Local Civil Rule 56.1, the Court construes Plaintiffs' failure to specifically controvert the correspondingly numbered paragraph in Defendants.' SUMF as an admission of the same.

employees at one branch.[106] However, while both Regina and McMichael testified that they would have recommended termination for employee violations of the Notary Policy, neither recall recommending the termination of Barbini, Henry, and Lawless.[107]

On September 9, 2015, Damyanidu finished drafting the termination reports for Barbini, Henry, and Lawless, and sent them to Regina for review and approval.[108] During her review, Regina revised Lawless's draft termination report to remove a reference to the text message incident, thus aligning the report to terminate Lawless based only on the findings of Fee's report.[109] That afternoon, Regina and Damyanidu met separately with Barbini, Henry, and Lawless to convey that their employment was being terminated.[110]

The report that Damyanidu issued to Barbini provided as follows:

Claudia violated the notary policy by notarizing, by her own admission, a Home equity loan without witnessing the actual signature of the clients in August 2015. The loan documents were signed with the Branch manager in the customer's home and brought back to the branch where Claudia notarized them. This is not only a violation of [First Niagara] policy but also is a violation of NY State notary law. The two most important things when notarizing a document are: 1) verify the person in front of you signing the document is who they say they are and 2) witness their signature. In this case Claudia failed to do both.[111]

The report that Damyanidu issued to Henry similarly provided as follows:

Maryetta violated the notary policy by notarizing, by her own admission, two Home equity loans without witnessing the actual signature of the clients in August 2015. In one of the occasions the loan documents were signed on 8/9/15 with the Personal Financial Associate in the Branch and Maryetta did not notarize[] them until

---

[106] (Defs.' SUMF ¶ 109.) Under Local Civil Rule 56.1, the Court construes Plaintiffs' failure to specifically controvert the correspondingly numbered paragraph in Defendants.' SUMF as an admission of the same.

[107] (Regina Dep. Tr. at 82:8–83:7, 116:15–117:2; McMichael Dep. Tr. at 67:9–12, 72:15–74:2.)

[108] (Defs.' SUMF ¶ 117.) Under Local Civil Rule 56.1, the Court construes Plaintiffs' failure to specifically controvert the correspondingly numbered paragraph in Defendants.' SUMF as an admission of the same.

[109] (Regina Dep. Tr. at 79:22–81:19.)

[110] (Defs.' SUMF ¶ 119; Pls. CSUMF ¶ 119.)

[111] (Defs.' SUMF ¶ 122; Pls. CSUMF ¶ 122.)

8/21/15 – all of that information was also verified through security tapes by the regional security officer. This is not only a violation of [First Niagara] policy but also is a violation of NY State notary law. The two most important things when notarizing a document are: 1) verify the person in front of you signing the document is who they say they are and 2) witness their signature. In this case Maryetta failed to do both.[112]

The report that Damyanidu issued to Lawless provided as follows:

August 2015 Hugh transported Home Equity loan documents that were signed by customer in the Pleasant Valley branch to the branch in Vassar and requested that the Assistant Branch Manager notarize them without the customer being present.

In another occasion, Hugh went to a customer's home and signed the Home Equity Loan documents that he later brought back to the Assistant branch manager to notarize. Hugh's request resulted in a First Niagara policy Violation and NY State Notary Law Violation. Both require that the notary when notarizing a document 1) verifies the person in front of them signing the document is who they say they are and 2) witnesses their signature.[113]

## L.    *Procedural History*

Plaintiffs filed their original complaint on October 8, 2016 (ECF No. 7)[114] and amended their complaint on January 4, 2017 (ECF No. 26). Defendants answered to the original complaint on December 23, 2016 (ECF Nos. 21 & 22) and to the amended complaint on January 25, 2017 (ECF Nos. 27 & 28). On October 13, 2017, the case was referred to Magistrate Judge Judith C. McCarthy for general pretrial matters such as discovery and non-dispositive pretrial motions. (ECF No. 35.) The parties completed discovery on November 21, 2019. (ECF No. 106.) Currently pending before the Court is Defendants' motion for summary judgment (Mot., ECF No. 139), which Plaintiffs have opposed ("Response in Opposition," ECF No. 143), and in support of which Defendant has filed a reply ("Reply," ECF No. 146).

---

[112] (Defs.' SUMF ¶ 126; Pls. CSUMF ¶ 126.)

[113] (Defs.' SUMF ¶ 130; Pls. CSUMF ¶ 130.)

[114] Plaintiffs filed their original complaint on October 8, 2016, but due to several filing errors on ECF, the complaint was successfully docketed on October 11, 2016.

17

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56(c), summary judgment must be granted if "there is no genuine issue of material fact and . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 n. 4 (1986). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1, 5 (2d Cir. 1999) (internal quotations and citations omitted). In order to prove that a genuine issue of material fact exists, a plaintiff "may not rest upon the mere allegations or denials of the pleading[s]," but must by affidavit or otherwise "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "Conclusory statements, conjecture or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).

Courts must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). The moving party bears the initial burden of demonstrating an absence of genuine issues of material fact. *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997). If the initial burden is met, the non-moving party "must produce specific facts indicating that a genuine issue of fact exists. If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted*." Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (internal quotations and citations omitted) (alteration in original).

**DISCUSSION**

In total, Plaintiffs assert fourteen causes of action against the Bank and the remaining Defendants in their individual and official capacities. On the one hand, Barbini asserts ten claims:

18

two Title VII claims based on gender discrimination (female) and retaliation (for opposing sexual harassment) against the Bank; three ADEA claims based on age discrimination (over 40 years old), retaliation (for opposing age discrimination) and hostile work environment (over 40 years old) against the Bank; and their respective equivalent claims under the NYSHRL against all Defendants. (Resp. in Opp'n at 17, 32, 35, 37.) On the other hand, Henry asserts four claims: two Title VII claims based on gender discrimination (female) and retaliation for (opposing sexual harassment) against the Bank, and their respective equivalent claims under the NYSHRL against all Defendants. (*Id.* at 17, 32, 37.) [115]

By their motion, Defendants contend in a nutshell that: (1) Plaintiffs' claims for discrimination and retaliation each fail for failure to establish a *prima facie* case, or alternatively, each fail to demonstrate that the reason for their termination was a pretext or that they were motivated at least in part by discrimination or retaliation, respectively; and (2) Plaintiffs' claims for hostile work environment fail for failure to establish the requisite level of hostility and that the same was motivated by discriminatory animus. (Mot. at 26, 29–32.) The Court addresses those arguments in that order.

---

[115] Plaintiffs originally asserted twenty causes of action in their Amended Complaint: fourteen by Barbini and six by Henry. (*See generally* Am. Compl.) However, on January 24, 2020, the Court held a premotion conference during which Plaintiffs' counsel confirmed that there were only fourteen causes of action in this case after they withdrew six of them, leaving eight claims for Barbini and six for Henry—although they failed to specify which particular causes remained. (*See* Defs.' Counsel Affs., Ex. 21 at 22:2–22, ECF No. 142-2.)

Confusingly and contrary to their representations to the Court, Plaintiffs now claim in their response in opposition that they are asserting *eighteen* causes of action:

This is an action for compensatory and punitive damages, proximately caused by Defendants' violation of Plaintiffs' right to be free of gender discrimination, hostile work environment, and retaliation as guaranteed by [Title VII] and the [NYSHRL] [12 causes of action], as well as Plaintiff Barbini's right to be free from age discrimination, retaliation and a hostile work environment under Title VII, the NYSHRL, and under the [ADEA] [6 causes of action].

(Resp. in Opp'n at 6.) Nonetheless, based on the extent that Plaintiffs discuss each of their claims in their response in opposition, the Court construes that Plaintiffs are in effect only asserting the fourteen claims as enumerated in this opinion.

## I.   Individual Defendants' Liability in their Individual and Official Capacities

Before reaching the substance of Plaintiffs' claims, the Court notes that "[n]either the ADEA nor Title VII allows for imposition of personal liability on the part of an individual, employee or supervisor." *See Mabry v. Neighborhood Defender Service*, 769 F. Supp. 2d 381, 391 (S.D.N.Y. 2011) (citing *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (holding that individual defendants may not be personally liable under Title VIII); *Parker v. Metro. Transp. Auth.*, 97 F. Supp. 2d 437, 452 (S.D.N.Y. 2000) (holding that an individual defendant may not be liable under the ADEA).

While the Second Circuit has yet to address whether plaintiffs may assert claims under Title VII or the ADEA against individuals in their official capacities, many courts within this Circuit (including this one) have disallowed claims against non-employer individuals sued in their official capacities because such claims are duplicative of claims against a corporate defendant. *See, e.g.*, *Garcia v. Yonkers Bd. of Educ.*, No. 15 Civ. 767 (NSR), 2016 WL 3064116, at *4 (S.D.N.Y. May 27, 2016) ("Plaintiff cannot assert any Title VII retaliation claims against the Individual Defendants, even in their official capacities, and all such claims are dismissed."); *Harrison v. Banque Indosuez*, 6 F. Supp. 2d, 224, 229 (S.D.N.Y. 1998) (dismissing the official capacity Title VII claims against a senior bank officer and supervisor); *Gray v. Shearson Lehman Bros., Inc.*, 947 F. Supp. 132, 135–36 (S.D.N.Y. 1996) (holding that Congress did not permit Title VII suits against individuals in their official capacities); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313–17 (2d Cir. 1995) ("[I]ndividual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII[.]" . . . "Congress never intended to hold agents individually liable for violations of [Title VII.]"), *abrogated on other grounds*, *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998).

Therefore, to the extent that Plaintiffs assert Title VII and ADEA claims against Damyanidu, Lawless, and McMichael in their individual and official capacities, the Court dismisses them as a matter of law.

But unlike Title VII and the ADEA, the NYSHRL allows for individual liability under certain circumstances—such as the one here, in which Plaintiffs brought their claims against Damyanidu, Lawless, and McMichael as "aiders and abettors." The NYSHRL makes it unlawful "for any person to aid, abet, incite, compel, or coerce" acts prohibited by the NYSHRL. *See* N.Y. Exec. Law. § 296(6). Courts have held that an "aider and abettor" is generally "a co-worker who actually participates in the conduct giving rise to a discrimination claim . . . even though that co-worker lacked the authority to either hire or fire the plaintiff." *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004) (citing *Tomka*, 66 F.3d at 1317). But importantly, aiding and abetting "is only a viable theory where an underlying violation has taken place." *Falchenberg v. N.Y. State Dep't of Educ.*, 338 F. App'x 11, 14 (2d Cir. 2009).

Thus, Plaintiffs' claims against Damyanidu, Lawless, and McMichael in their individual capacities under the NYSHRL remain at issue because of their undisputed roles in Plaintiffs' termination.[116] And consequently, Plaintiffs' claims against Damyanidu, Lawless, and McMichael in their individual capacities under the NYSHRL will survive summary judgment so long as Plaintiffs' counterpart claims against the Bank survive summary judgment.

That said, while Plaintiffs purport to bring their NYSHRL causes of action against Damyanidu, Lawless, and McMichael in their "official capacities," "[a]n official capacity claim

---

[116] (*See, e.g.*, Defs.' SUMF ¶¶ 83, 117; Pls.' CSUMF ¶¶ 83, 117 (agreeing that Damyanidu, Plaintiffs' area manager, commenced the investigation and drafted the reports that led to their termination); Defs.' SUMF ¶¶ 34–36, 82; Pls.' CSUMF ¶¶ 34–36, 82 (agreeing that Lawless sent inappropriate text messages to Henry and he also reported her alleged violation of the Notary Policy to Damyanidu that led the investigation and Plaintiffs' termination); Defs.' SUMF ¶¶ 8, 63, 66; Pls.' CSUMF ¶¶ 8, 63, 66 (agreeing on McMichael's role as the Bank's HR director at the time of the termination and that he only issued a final written warning to Lawless).)

against an employee of a private corporation is viewed as a claim against the corporate entity itself." *Sloth v. Constellation Brands, Inc.*, 883 F. Supp. 2d 359, 359 n.1 (W.D.N.Y. 2012) (citing *Galloway v. Swanson*, No. 5:09-CV-02934-JRA, 2012 WL 646074, at *8 (N.D. Ohio Feb. 28, 2012)). Hence, as Damyanidu, Lawless, and McMichael are all current or former employees of the Bank, and the Bank is already named as a defendant, the Court need not consider the NYSHRL claims against them in their "official capacities." *Id.* (citing *Owens v. Connections Cmty. Support Programs, Inc.*, 840 F. Supp. 2d 791, 796 (D. Del. 2012) (where "employer is named as a defendant, the same discrimination claim against an employee in his official capacity is redundant."); *see also Doe v. Bloomberg, L.P., et al.*, 36 N.Y.3d 450, 459 (N.Y. 2021) (holding that "where a plaintiff's employer is a business entity, the shareholders, agents, limited partners, and employees of that entity are not employers" within the meaning of the NYSHRL; "[r]ather, those individuals may only incur liability only for their own discriminatory conduct, for aiding and abetting such conduct by others, or for retaliation against protected conduct.").

## II.  Exhaustion of Federal Claims

Next, as a threshold matter, the Court addresses whether Plaintiffs properly exhausted their administrative remedies with respect to their Title VII and ADEA claims before bringing the instant suit.

Generally, to bring a Title VII discrimination claim in federal district court, plaintiffs must first exhaust their administrative remedies by "filing a timely charge with the Equal Employment Opportunity Commission ("EEOC") or with 'a State or local agency with authority to grant or seek relief from such practice.'" *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 82–83 (2d Cir. 2001) (quoting 42 U.S.C. § 2000e–5(e)); *see also Duplan v. City of New York*, 888 F.3d 612, 614 (2d Cir. 2018) ("Exhaustion is an essential element of Title VII's statutory scheme.") (internal quotations omitted).

22

Unlike Title VII, the ADEA provides that "[n]o civil action may be commenced by an individual . . . until 60 days after a charge alleging unlawful discrimination has been filed with the [EEOC]." 29 U.S.C. § 626(d)(1). Yet, the ADEA further requires that an EEOC charge be filed within 180 days, or 300 days for a deferral state "after the alleged practice occurred." *Id.* Thus, "while a putative plaintiff is not required to receive authorization to sue from the agency prior to commencing litigation—unlike the Title VII context—the ADEA nevertheless sets out a statutory administrative requirement prior to filing suit." *Rusis v. Int'l Bus. Machines Corp.*, 529 F. Supp. 3d 178, 198 (S.D.N.Y. 2021) (citing *Holland v. City of New York*, No. 10-CV-2525, 2011 WL 6306727, at *4 (S.D.N.Y. Dec. 16, 2011)).

The purpose of this requirement is articulated in the statute itself, which provides that, after receiving a charge, the EEOC "shall promptly notify all persons named in such charge as prospective defendants in the action and shall promptly seek to eliminate any alleged unlawful practice by informal methods of conciliation, conference, and persuasion." *Id.* (quoting 29 U.S.C. § 626(d)(2)). Courts routinely emphasize the remedial purpose of the statute's administrative exhaustion requirement in adjudicating claims under the ADEA. *See Tolliver v. Xerox Corp.*, 918 F.2d 1052, 1057 (2d Cir. 1990); *see also Holowecki v. Fed. Exp. Corp.*, 440 F.3d 558, 564 (2d Cir. 2006) ("*Holowecki II*") ("[P]roviding the EEOC with an opportunity to eliminate the discriminatory practice or practices alleged, and to effect voluntary compliance with the requirements of the ADEA through informal methods of conciliation, conference, and persuasion, is an essential element of the ADEA's statutory scheme." (cleaned up)).

Courts also consider complaints of discrimination filed with the New York State Division of Human Rights ("NYSDHR") as if they were cross-filed with the EEOC. *See Govia v. Century 21, Inc.*, 140 F. Supp. 2d 323, 325, n. 1 (S.D.N.Y. 2001). "But unlike Title VII [and the ADEA],

23

the NYSHRL . . . do[es] not require exhaustion of administrative remedies" prior to commencing

an equivalent claim. *Manos v. Geissler*, 377 F. Supp. 2d 422, 428 (S.D.N.Y. 2005) (citing *Lumhoo*

*v. Home Depot USA, Inc.*, 229 F. Supp. 2d 121, 136 n. 13 (E.D.N.Y. 2002)). To that end, the Court

only addresses whether Plaintiffs exhausted their claims under federal law and not their equivalent

claims under state law.

       A.      *Henry's Title VII Claims*

The record here shows that on October 5, 2015, Henry filed a verified complaint with the

NYSDHR against the Bank, Damyanidu, and Lawless. (*See* Am. Compl. ¶ 11, Ex. B.) While the

record does not include Henry's original NYSDHR complaint, the Court considers all other

NYSDHR documents available in the record to determine whether Henry exhausted her Title VII

claims against Defendants. After a thorough review of the record, the Court concludes that Henry

exhausted her two Title VII claims based on gender discrimination and retaliation.

The NYSDHR's Final Investigation Report and Basis of Determination notes that Henry

alleged that the Bank, Damyanidu, and Lawless engaged in an "unlawful discriminatory practice"

relating to employment because of sex, [and] opposed discrimination/retaliation in violation of

N.Y. Exec. Law, art. 15." (*Id.* ¶ 12, Ex. B.) After its investigation, the NYSDHR found probable

cause to believe that Defendants "have engaged in or are engaging in the unlawful discriminatory

practice complained of." (*Id.* ¶ 13, Ex. B.) Subsequently, on September 8, 2016, the EEOC issued

Henry a "notice of right to sue" letter. (*Id.*, Ex. A.)

In sum, the record shows that Henry explicitly asserted—and thus, exhausted—her Title

VII claims based on gender discrimination and retaliation against the Bank.

       B.      *Barbini's Title VII and ADEA Claims*

The record shows that on February 22, 2016, Barbini filed a charge of discrimination with

the EEOC against the Bank. (*See* Am. Compl. ¶ 15, Ex. C.) Within her charge, she alleged that the

Bank engaged in unlawful age discrimination and retaliation when it terminated her for being over 40 and for opposing sexual harassment in the workplace in violation of federal and state law. (*Id.*) She also alleged that Damyanidu and Lawless "subject[ed] [her] to a systemic pattern of age discrimination involving a battery of practices which had an unlawful disparate impact on me and my employment opportunities, as well as a hostile work environment." (*Id.*) Barbini further alleged that immediately after reporting to Damyanidu that Lawless instructed her to notarize documents and complaining about being discriminated because of her age, Damyanidu started the investigation into notarization practices that eventually led to her termination. (*Id.*)

On July 7, 2016, when her EEOC charge was pending for more than 130 days, Barbini sent the EEOC a letter requesting an early "notice of right to sue" letter. (*Id.* ¶ 16, Ex. D.) Five days later, the EEOC granted Barbini's request and sent her an early "notice of right to sue" letter. (*Id.* ¶ 17, Ex. E.)

In sum, the record shows that Barbini explicitly alleged in her EEOC charge—and thus exhausted[117]—(1) an ADEA claim for age discrimination; (2) an ADEA claim for hostile work environment based on age discrimination; (3) an ADEA retaliation claim for opposing age discrimination; and (4) a Title VII retaliation claim for opposing sexual harassment. However, nowhere in her EEOC charge does she explicitly allege a Title VII claim for gender discrimination.

"[C]laims that were not asserted before the EEOC [or an appropriate State or local agency] may [still] be pursued in a subsequent federal court action if they are reasonably related to those

---

[117] Many courts, both within this Circuit and beyond, have raised the question of whether such early "notice of right-to-sue letters" are permissible for purposes of exhausting federal claims of discrimination. *See, e.g.*, *Arroyo v. WestLB Admin., Inc.*, 213 F.3d 625, *1 (2d Cir. 2000) (citing cases). However, the Court declines to address the issue because Defendants fail to raise it in their motion and the Second Circuit has (without deciding the ultimate question) held that the validity of an early right-to-sue notice "is not jurisdictional in nature." *Id.*; *see also Ibraheem v. Wackenhut Servs., Inc.*, 29 F. Supp. 3d 196, 208 n. 9 (E.D.N.Y. 2014) ("[E]ven if invalid, an early right to sue letter is not jurisdictional in nature."); *Kahn v. Objective Solution, Int'l*, 86 F. Supp. 2d 377, 380 (S.D.N.Y. 2000) ("The early issuance of a right-to-sue latter would not deprive this Court of jurisdiction." (citing cases supporting and rejecting this proposition)).

that were filed with the agency." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 177 (2d Cir. 2005) (quoting *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001) (per curiam)). "Reasonably related conduct is that 'which would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made.'" *Id.* (quoting *Fitzgerald v. Henderson*, 251 F.3d 345, 358 (2d Cir. 2001)); *see also Mathirampuzha v. Potter*, 548 F.3d 70, 77 (2d Cir. 2008) (providing that claim is reasonably related when "administrative complaint can be fairly read to encompass the claims ultimately pleaded in a civil action or to have placed the employer on notice that such claims might be raised.").

In determining whether a claim is "reasonably related" to the EEOC charge, "the focus should be on the factual allegations made in the [EEOC] charge itself . . ." and on whether those allegations "gave the [EEOC] 'adequate notice to investigate'" the claims asserted in court. *Williams v. N.Y. City Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006) (quoting *Deravin v. Kerik*, 335 F.3d 195, 201–02 (2d Cir. 2003)).

After reviewing the record, the Court concludes that Barbini's Title VII claim for gender discrimination is not "reasonably related" to the allegations in her EEOC charge. To begin, Barbini did not check the box for "sex" on the cover sheet to her EEOC charge. (*See* Am. Compl., Ex. C.) Neither did she include in the EEOC charge's factual statement any reference to any alleged discrimination against her on the basis of being female. (*See generally id.*) Rather, her allegations in the EEOC charge focus on the alleged age discrimination by Damyanidu and Lawless, and the retaliation she suffered for helping Henry with her sexual harassment complaint. (*Id.*) Indeed, the first references to any alleged gender discrimination against Barbini are contained in her original complaint of the instant lawsuit, filed October 8, 2016. (*See* Compl. ¶ 78, ECF No. 7 ("[D]efendant FIRST NIAGARA has denied plaintiff BARBINI her right to a workplace free from *discrimination*

because of her gender as guaranteed [sic] her by reason of Title VII, 42 U.S.C. § 2000e *et seq*."
(emphasis in original).)

Moreover, Barbini cannot overcome her failure to exhaust her Title VII claim for gender
discrimination by "piggybacking" onto the allegations from Henry's NYSDHR complaint. The
single-filing rule, commonly known as the "piggybacking" doctrine, is a judicially created
exception to the administrative exhaustion requirement. *See Rusis*, 529 F. Supp. 3d at 199. Under
the single-filing rule, plaintiffs who have never filed an EEOC charge, and therefore have not given
notice of her discrimination complaint to either their employer or the EEOC, can still litigate their
Title VII claims so long as they fall "within the scope" of the timely filed claims of another
individual. *See Dargento v. Bally's Holiday Fitness Ctrs.*, 990 F. Supp. 186, 193 (W.D.N.Y. 1997)
(citing *Snell v. Suffolk Cnty.*, 782 F.2d 1094, 1100–1101 (2d Cir. 1986)).

However, the Second Circuit has held that "[a]n individual who has previously filed an
EEOC charge cannot piggyback onto someone else's EEOC charge." *Holowecki II,* 440 F.3d at
564 (citing *Levy v. United States Gen. Accounting Office,* 175 F.3d 254, 255 (2d Cir. 1999) (per
curiam); *Snell¸*782 F.2d at 1100 (stating that "non-filing plaintiffs" can take advantage of the rule);
*accord Rusis*, 529 F. Supp. 3d at 203 (rejecting plaintiffs' arguments that *Holowecki II*'s
"unequivocal holding" applies only to certain situations). As noted by other Circuit Courts of
Appeals, allowing an individual who has previously filed a charge to abandon that charge and
piggyback onto the charges of another individual would too often frustrate the EEOC's statutorily
mandated efforts to resolve an individual charge through informal conciliation. *Id.* at 565 (citing
*Gitlitz v. Compagnie Nationale Air France*, 129 F.3d 554, 557–58 (11th Cir. 1997); *Anderson v.
Unisys Corp.*, 47 F.3d 302, 308–09 (8th Cir. 1995)). Thus, the Court dismisses Barbini's Title VII

claim for gender discrimination against Defendants for failure to satisfy the exhaustion requirement.

Having determined that Plaintiffs' claims under federal law were properly exhausted, except for Barbini's Title VII gender discrimination claim, the Court now addresses the substance of Plaintiffs' remaining claims under federal and state law.

## III. Discrimination Claims Based on Gender and Age

### A.    *Legal Standards*

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The ADEA similarly makes it unlawful for employers "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age" 29 U.S.C. § 623(a)(1). The ADEA covers individuals that are at least forty years old. *Id.* The NYSHRL also provides that it is "an unlawful discriminatory practice" for an employer "to discriminate against such individual in compensation or in terms, conditions or privileges of employment" based on an individual's sex or age, among other characteristics. N.Y. State Exec. Law § 296(1)(a).

Courts analyze claims based on circumstantial evidence brought under the ADEA, Title VII, and the NYSHRL under the burden-shifting analysis articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See, e.g., Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117 n.2 (2d Cir. 2010) ("We review discrimination claims brought under the NYSHRL according to the same standards that we apply to Title VII discrimination claims."); *Gorzynski v. JetBlue Airways Corp.,* 596 F.3d 93, 105–06 (2d Cir. 2010) (applying framework to ADEA and NYSHRL claims based on age discrimination).

Under the *McDonnell Douglas* framework, the plaintiff must establish a *prima facie* case. 411 U.S. at 802. To establish a *prima facie* case of either gender or age discrimination, a plaintiff must demonstrate that "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Liebowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009) (Title VII); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000) (ADEA).

The plaintiff's burden at this stage is "minimal" or "de minimis." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (describing burden for discrimination claims); *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (describing burden for retaliation claims). However, a plaintiff must establish *all* four elements of the *prima facie* case before proceeding with the next step of the *McDonnell Douglas* framework. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311–12 (1996) ("As the very name 'prima facie case' suggests, there must be at least a logical connection between each element of the *prima facie* case and the illegal discrimination for which it establishes a 'legally mandatory, rebuttable presumption[.]'" (citations omitted)).

Once a plaintiff has made a *prima facie* case, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas,* 411 U.S. at 802. In other words, "[t]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507 (1993) (internal quotation marks and emphasis omitted).

Upon the defendant's proffer of a non-discriminatory reason, the presumption of discrimination arising with the *prima facie* case "drops from the picture," *Weinstock,* 224 F.3d at 42 (citing *Hicks,* 509 U.S. at 510–11), and the "final and ultimate burden" then returns to the plaintiff to demonstrate that "defendant's reason is in fact [a] pretext for unlawful discrimination," *Cortes*, 802 F.3d at 231; *see McDonnell Douglas,* 411 U.S. at 804; *Weinstock*, 224 F.3d at 42. The plaintiff must "produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not the discrimination was the real reason for the employment action." *Weinstock*, 224 F.3d at 42 (internal quotation marks omitted) (citation omitted). Alternatively, a plaintiff may meet its final burden by relying on direct or indirect evidence demonstrating that "an impermissible reason was a motivating factor, without proving that the employer's proffered explanation played no role in its conduct." *Holtz*, 258 F.3d at 81 (internal quotations omitted)). "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." *Weinstock*, 224 F.3d at 42.

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent. At the same time, . . . the salutary purposes of summary judgment-avoiding protracted and harassing trials-apply no less to discrimination cases than to other areas of litigation." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (quotation marks, citations, and alterations omitted.) As in any other case, a plaintiff in an employment discrimination or retaliation case "must 'do more than simply show that there is some metaphysical doubt as to the material facts.' She must come forth with evidence sufficient to allow a reasonable jury to find in her favor." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (quoting

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal citations omitted). "[C]onclusory statements," *Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018), and "affidavit[s] that contradict[ ] the party's previous sworn testimony," *In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013), cannot defeat summary judgment.

> B.      Application

>> 1.      Plaintiffs' Claims of Gender Discrimination[118]

The parties do not dispute that Plaintiffs meet the first and third elements of the *prima facie* case for gender discrimination because they are both women who were terminated from their employment.[119] However, Defendants contend that Plaintiffs fail to establish the second and fourth elements of their *prima facie* case because the Bank terminated them after they violated the Notary Policy (a non-discriminatory reason) and nowhere in the record is there any circumstance from which a reasonable jury could conclude an inference of discrimination exists in such termination. (Mot. at 26–27.)

In opposition, Plaintiffs argue that they meet the second and fourth elements of the p*rima facie* case because: first, they both had satisfactory performance evaluations and no prior record of misconduct; and second, they argue the record contains evidence of disparate treatment in the Bank's discipline and termination procedures between its male and female employees. (Resp. in Opp'n at 27.) Additionally, in rebutting Defendants' non-discriminatory reason for their termination, Plaintiffs indicate that the record contains a material dispute of fact concerning the existence of a zero-tolerance policy regarding notaries who violate the Notary Policy, particularly

---

[118] By way of clarification, Plaintiffs' claims for gender discrimination for purposes of this section include (a) Henry's gender discrimination claims under Title VII and the NYSHRL; and (b) Barbini's gender discrimination claims under the NYSHRL.

[119] (Defs.' SUMF ¶ 5; Pls.' CSUMF ¶ 5.)

because although Damyanidu, Regina, McMichael, and Bechtel all testified to its existence, no written reference to such policy exists anywhere. (*Id.* at 28.)

After thoroughly reviewing the record, the Court concludes that a material dispute of fact exists precluding summary judgment against Plaintiffs' claims for gender discrimination.

To begin, viewing the evidence in the light most favorable to Plaintiffs, the Court is of the view that a reasonable jury could conclude that they establish a *prima facie* case of gender discrimination. Regarding the second element (*i.e.*, being qualified for the position), the record contains Plaintiffs' work evaluations and performance reviews from their tenure at the Bank, all of which show that they received high marks for their work performance.[120] None of those evaluations and reviews contain any negative remarks, past violations, or inappropriate behavior.[121] Although Damyanidu claims that Henry behaved inappropriately towards Lawless at one point, and that she received a customer complaint against Barbini for failure to comply with the Bank's procedure, Damyanidu herself decided not to draft any warning against them contrary to the Bank's standard procedure.[122] Indeed, despite both Damyanidu and Lawless reprimanding Barbini in July 2015 for violating the Bank's procedures, Lawless wrote in Barbini's Midyear Review that she was "low risk" and "pacing to exceed" in terms of risk and compliance.[123] A reasonable jury could infer from those facts that, even if Henry did behave inappropriately and Barbini did fail to comply with the Bank's procedure, such behaviors were only trivial and unimpactful to their work performance.

---

[120] (Barbini Dep. Tr. at 96:3–98:6; Joint Pls.' Counsel Affs., Exs. M, N, & O.)

[121] (Joint Pls.' Counsel Affs., Exs. M, N, & O.)

[122] (Damyanidu Dep. Tr. at 102:15–103:25; 104:16–105:4 (April 25, 2018); Damyanidu Aff. ¶ 4.)

[123] (Barbini Dep. Tr. at 96:3–98:6; Joint Pls.' Counsel Affs., Ex. O.)

Regarding the fourth element, a reasonable jury could find from the record that the circumstances surrounding Plaintiffs' termination give rise to an inference of discrimination in the form of disparate treatment. When considering whether plaintiffs raise an inference of discrimination through disparate treatment, the Second Circuit has held that plaintiffs "must show [they] were 'similarly situated in all material respects' to the individuals with whom they seek[] to compare [themselves]." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citing *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)). To satisfy the "all material respects" standard for being similarly situated, plaintiffs must show that their co-employees were "subject to the same performance evaluation and discipline standards." *Id.* (citing *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 96 (2d Cir. 1999)).   In addition, plaintiffs "must show that similarly situated employees who went undisciplined engaged in comparable conduct." *Id.* (citing *Norville*, 118 F.3d at 64). The conduct of those similarly situated employees "need not be identical . . . for the two to be similarly situated." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804).

Here, the record shows that prior to Plaintiffs' terminations, the Bank had terminated two other people for violations of the Notary Policy after Damyanidu participated in their investigation: a female customer care representative and a male personal financial assistant.[124] The record also shows that the Bank has not terminated every employee who has violated of the Notary Policy. For example, in another investigation in which Damyanidu participated, the Bank only disciplined but did not terminate Stephen Mehlman (or "Mailman") in 2013.[125] Further, the record indisputably shows that while the Bank terminated Lawless for instructing Barbini to notarize two loans without the customer being present,[126] it did not terminate Robustelli—who instructed Henry

---

[124] (*Id.* at 159:4–161:8.)

[125] (Damyanidu Dep. Tr. at 157:23–158:25 (April 25, 2018); Regina Dep. Tr. at 122:22–14. 4–25.)

to notarize two loans without the customer being present.[127] Indeed, Fee's report uses the substantially the same language in describing the behavior of both men.[128]

Viewing these facts in the light most favorable to Plaintiffs, a reasonable jury could find that these other five Bank employees are similarly situated to Plaintiffs because (1) Damyanidu participated in the investigation of all these employees; and (2) they all purportedly violated the Bank's Notary Policy. The Court recognizes that some of these employees were notaries and others were not. For instance, Mehlman, Barbini, and Henry were all notaries, and the rest were not.[129] However, this fact does not alter the Court's conclusion; in fact, it lends further support to it. For one thing, the Bank only disciplined but did not terminate Mehlman, the only male notary who violated the Notary Policy, while it summarily terminated the two other female notaries, Barbini and Henry. On the other hand, the Bank did not terminate all three male non-notary employees for violating the Notary Policy, while it did terminate the only female non-notary employee.

With that mind, the record indicates that out of the seven Bank employees who purportedly violated the Notary Policy, all three female employees were terminated in comparison to only two of the four male employees. From these figures alone, a reasonable jury could find disparate treatment between the Bank's application of the "zero-tolerance" policy towards men and women. But additionally, while Defendants claim that the Bank terminated Lawless solely for his violation of the Notary Policy, the record shows that Damyanidu initially drafted Lawless's termination

---

[126] (Defs.' SUMF ¶ 130; Pls. CSUMF ¶ 130.)

[127] (Joint Pls.' Counsel Affs., Ex. AA.)

[128] (*Compare id.* ("[Barbini] [w]as requested by BM Hugh Lawless to notarize two loans originated in the Pleasant Valley branch without the present[.]") *with id.* ("[Henry] [w]as requested by PFA Robert Robustelli to notarize two HE loans without the customer present.").

[129] (Damyanidu Dep. Tr. at 157:23–161:14 (April 25, 2018); Defs.' SUMF ¶ 6; Pls. CSUMF ¶ 6; Robustelli Dep. Tr. at 52:15–53:3; Defs.' SUMF ¶ 12.)

report to include reference to the text message incident with Henry, which Regina later removed to align the termination report with Fee's findings.[130] From those facts, a reasonable jury could infer that but for the text message incident with Henry, the Bank would not have terminated Lawless—further underscoring the Banks' disparate treatment of male and female employees who violate the Notary Policy.

Finally, the Court is of the view that there is a material dispute of fact concerning Defendants' argument that the Bank terminated Plaintiffs for a legitimate, non-discriminatory reason—namely, a violation of the Notary Policy. For one, when drawing all inferences in their favor, the record suggests that a reasonable jury could conclude that Plaintiffs effectively did not violate the Notary Policy by the mere fact that they notarized documents outside the presence of signatory customers. Notably, the Notary Policy requires that the signatory requesting the notary service "must be physically present" in front of the notary and sign the pertinent document "prior to [the notary] applying the . . . stamp to the document."[131] However, such language does not expressly provide when exactly the notary must apply the stamp to the document. In other words, it neither requires that the notary apply the stamp *immediately after* the signatory signs the document nor that the signatory remain physically present *after signing the document in front of the notary* during the application the stamp.

With that in mind, a reasonable jury could conclude that Plaintiffs did not violate the Notary Policy after considering that (1) Henry testified about having admitted to notarizing a document outside the presence of the customer *a few hours after the customer had left the Bank*;[132] and (2)

---

[130] (Regina Dep. Tr. at 79:22–81:19.)

[131] (Defs.' SUMF ¶ 68; Pls.' CSUMF ¶ 68.)

[132] (Henry Dep. Tr. at 88:17–89:19.)

Barbini testified that she does not recall ever notarizing a document without the customer present, but that if she did, then she must have known the customer.[133]

But even if Plaintiffs did in fact violate the Notary Policy, the record shows that there is a material dispute of fact as to whether the "zero-tolerance" policy exists. For example, while Damyanidu, Regina, McMichael, and Bechtel all testified about the existence of a "zero-tolerance" policy for violations of the Notary Policy, none of them could refer to a single written reference of such policy anywhere in the Bank's corporate documents.[134] Further, Barbini, Henry, and Robustelli testified that they did not know about the Notary Policy or where to find it.[135] In fact, Robustelli, who had been a banker for 13 years, testified that he had never been aware "that the notary physically had to watch the signature happen at the time that the documents were . . . signed[.]"[136]

Consequently, as the existence of the Bank's "zero-tolerance" policy solely depends on the credibility of available witness testimony, the Court cannot resolve this matter because it is unable to assess the credibility of these witnesses at summary judgment. Accordingly, the Court leaves these credibility issues for a jury to decide. *See, e.g.*, *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."); *Colby v. Klune*, 178 F.2d 872, 873 (2d Cir. 1950) ("[O]nly in [a trial on oral testimony] can the trier of the facts . . . observe the witnesses' demeanor; and that demeanor—absent, of course, when trial is by affidavit or

---

[133] (Barbini Dep. Tr. at 153:24–154:2, 156:17–20.)

[134] (Damyanidu Dep. Tr.  at 147:9–25, 151:13–15 (April 25, 2018); McMichael Dep. Tr. at 17:25–19:10, 95:18–24; Regina Dep. Tr. at 38:23–39:14, ECF No. 145-11; Bechtel Dep. Tr. at 132:15–133:22, ECF No. 145-12.)

[135] (Henry Dep. Tr. 16:11–15, 83:8–84:15; Barbini Dep. Tr. at 48:8–13, 52:14–25; Robustelli Dep. Tr. at 61:2–16.)

[136] (Robustelli Dep. Tr. at 52:15–53:3.)

deposition—is recognized as an important clue to witness' credibility. When . . . the ascertainment (as near as may be) of the facts of a case turns on credibility, a triable issue of fact exists, and the granting of a summary judgment is error.") (footnote omitted).

Therefore, the Court denies summary judgment against Henry's claims for gender discrimination against Defendants under Title VII and the NYSHRL, and Barbini's gender discrimination claims against Defendants under the NYSHRL.

### 2.    Barbini's Claims of Age Discrimination

As in Plaintiffs' gender discrimination claims, the parties do not dispute that Barbini meets the first and third elements of the *prima facie* case for age discrimination because she was sixty-six years old at the time the Bank terminated her.[137] But likewise, Defendants similarly contend that Barbini fails to establish the second and fourth elements of her *prima facie* case because the Bank terminated her after she violated the Notary Policy (a non-discriminatory reason) and nowhere in the record is there any circumstance from which a reasonable jury could conclude an inference of discrimination exists in such termination. (Mot. at 26–27.)

As the Court noted above in analyzing Plaintiffs' gender discrimination claims, Barbini adduces sufficient evidence from the record upon which a reasonable jury can find that she meets the second element of her *prima facie* case. Furthermore, because there is a material dispute of fact as to whether the zero-tolerance policy exists, if Barbini successfully establishes the fourth element of her *prima facie* case, then she would also successfully rebut Defendants' proffered non-discriminatory reason for her termination. That is why, the Court need only focus on whether she establishes the fourth element—whether the evidence raises an inference of discrimination.

---

[137] (Defs.' SUMF ¶ 4; Pls.' CSUMF ¶¶ 4, 153.)

In short, Barbini argues that she meets the fourth element of the p*rima facie* case because Defendants made several age-related discriminatory remarks to Barbini and that they replaced her with younger and less qualified employees. (Resp. in Opp'n at 20–21.)   But after thoroughly reviewing the record, the Court disagrees.

Even when drawing all inferences in Barbini's favor, the Court is of the view that the record contains no concrete evidence upon which a reasonable jury could find an inference of discrimination. To begin, the fact that the Bank replaced Barbini with Cepko, who is substantially younger than her, "does not itself prove unlawful discrimination." *Fagan v. New York State Elec. & Gas Corp.*, 186 F.3d 127, 134 (2d Cir. 1999) (citations omitted); *see also Coleman v. Prudential Relocation*, 975 F. Supp. 234, 242 (W.D.N.Y. 1997) ("If plaintiff's case could survive a summary judgment motion merely because her duties were assumed by a younger person, that would mean that 'virtually every employee over forty years old [who was terminated and whose duties were assigned to someone younger] could state an age claim that would withstand summary judgment. Such a holding would be tantamount to saying that a *prima facie* case would always suffice to raise issues of fact about the truth of the employer's proffered reason, which would render the *McDonnell Douglas* . . . analysis pointless.'" (internal citations omitted)).

But notably, the only evidence purporting to support an inference of age discrimination against Barbini is Barbini's own conclusory allegations and subjective impressions, all of which are insufficient to defeat summary judgment. "[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." *Conroy v. New York State Dep't of Correctional Servs.*, 333 F.3d 88, 94 (2d Cir. 2003). Nor will plaintiffs' subjective impressions provide a sufficient basis for inferring discrimination to defeat summary judgment. *See Littman v. Firestone Tire & Rubber Co.*, 709 F. Supp. 461, 466 (S.D.N.Y. 1989); *see also Cameron v. Cmty.*

*Aid for Retarded Children, Inc.*, 335 F.3d 60, 65 (2d Cir. 2003) (where decisionmaker's remark or conduct is facially neutral, the court should not infer discriminatory intent, because "[c]hoosing one explanation over another without more evidence is a matter of speculation").

For instance, as to Damyanidu, Barbini testified at deposition that she knew Damyanidu wanted to get rid of her and replace her because Barbini "did not fit the look, the character, and [her] age."[138] Yet, Barbini also admitted that Damyanidu never said anything verbally or in writing, or that any other employees told Barbini anything to that effect.[139] Instead, Barbini testified that she had a "gut feeling" that Damyanidu wanted to get rid of her due to her age based on Damyanidu's apparent aggressive sales personality, body language and purported disgusted looks towards Barbini.[140] Hence, Barbini's self-admitted subjective impressions and other conclusory allegations about Damyanidu's alleged discrimination improperly provide a reasonable jury only matters of speculation.

As to Lawless, Barbini testified that he made derogatory comments about her age when he once verbally reprimanded her about her performance in making cold calls to customers and told her that "if he had his way, he [would] have take[n] [her] to the shed."[141] But when Defendants' counsel asked her what she understood that term meant, Barbini replied that she did not understand it in full, but that she knew it meant "[a] beating . . . for punishment" and that "he was trying to destroy [her] self-esteem."[142] Barbini also testified that she thought Lawless made derogatory comments about her age when he once called the Pleasant Valley branch before 9:00 am and asked

---

[138] (Barbini Dep. Tr. at 26:4–7.)

[139] (*Id.* at 27:18–9.)

[140] (*Id.* at 28:10–32:22, 36:21–42:25.)

[141] (*Id.* at 79:23–83:14, 84:18–85:2.)

[142] (*Id.* at 85:2–25.)

her if she was asleep.[143] Barbini further testified she could not recall any other occasion because she tried to "wipe it out" of her mind as it was not pleasant working with Lawless.[144]

However, even when drawing all inferences in Barbini's favor, Lawless's comments without more provide no basis on which a reasonable jury could find an inference of age discrimination against Barbini. "Neutral comments unrelated to a [p]laintiff's protected group are insufficient to give rise to an inference of age discrimination." *Andretta v. Napolitano*, 922 F. Supp. 2d 411, 422 (E.D.N.Y. 2013) (citing *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 92 n. 2 (2d Cir. 2001)). "Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff." *Pronin v. Raffi Custom Photo Lab., Inc.*, 383 F. Supp. 2d 628, 636 (S.D.N.Y. 2005) (citations omitted). Moreover, even if made by decision makers, stray remarks unrelated to the decision behind plaintiff's adverse employment action without more are insufficient to establish a case of employment discrimination. *See Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 56 (2d Cir. 1998); *Campbell v. Alliance Nat'l Inc.*, 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000).

To be sure, a reasonable jury could conclude that Lawless's comments are sophomoric and impertinent in the workplace. However, the record contains no evidence on which a reasonable jury could infer Lawless's comments were motivated by age discrimination against Barbini. For instance, the record contains no evidence supporting an inference that being asleep at the workplace before 9:00 a.m. is so closely associated with employees over the age of 40 so that a reasonable jury could find discriminatory animus. Nor does it contain any evidence doing the same

---

[143] (*Id.* at 79:23–80:4; 195:22–196:19.)

[144] (*Id.* at 195:4–16; 196:9–197:4.)

for the phrase "taking someone to the shed." *Cf. Langel v. Arkansas Foundation for Medical Care*, No. 4:17-cv-00496-KGB, 2021 WL 4027719, at *5 (E.D. Ark. 2021) (record showed assistant manager previously counseled defendant-supervisor not to use the phrase "don't make me take you to my shed and crack my whip" anymore with African American plaintiff-employee because it could be taken as racially offensive).

Besides, even if the Court were to assume Lawless's comments did reflect discriminatory animus, the record indisputably shows that they were made made by a non-decisionmaker— Lawless, who in fact was terminated alongside Barbini[145]—and thus, "as a matter of law, are insufficient to raise an inference of discrimination." *De la Cruz v. City of New York*, 783 F. Supp. 2d 622, 643 (S.D.N.Y. 2011) (collecting cases).

Moreover, the Court notes that Barbini's other evidence that purportedly supports an inference of discrimination comes from an affidavit dated August 3, 2020, which she submitted in responding to the instant motion for summary judgment almost two years after her deposition testimony on May 3, 2018. Such affidavit may be viewed as self-serving.

The Second Circuit has previously held "that a party cannot create an issue of fact by submitting an affidavit in opposition to summary judgment that contradicts prior deposition testimony." *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 104 (2d Cir. 2010) (citing *Perma Research and Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)). However, if the allegations in the affidavit, rather than contradicting, explain or amplify prior deposition testimony, then the affidavit may still create a genuine issue of material fact sufficient to defeat summary judgment. *See Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996). But as mentioned above, neither mere conclusory allegations, speculation, nor subjective impressions

---

[145] (Lawless Dep. Tr. at 225:11–226:2.; Defs.' SUMF ¶ 131; Pls. CSUMF ¶ 131.)

will provide a sufficient basis for inferring discrimination to defeat summary judgment. *See Conroy*, 333 F.3d at 94; *Littman*, 709 F. Supp. at 466; *Cameron*, 335 F.3d at 65.

Here, the record shows that some of the relevant allegations in Barbini's affidavit contradict her deposition testimony. For example, as mentioned above, Barbini initially testified that she did not understand in full what "take you out to the shed" meant, but that she understood it to mean punishment.[146] However, in the affidavit she submitted two years later, Barbini provides that "[she] did not want to think that this statement was a reference to [her] age at first, *but it clearly was*. . . . [H]e was basically implying that he wanted to put me out to pasture like an old farm animal and that he wanted to give me a beating."[147] Barbini's other relevant allegations in her affidavit seeking to explain or amplify her relevant deposition testimony fair no better, as they simply reiterate her testimony's conclusory allegations, speculation, or subjective impressions, or provide new ones. For example, Barbini averred during her deposition testimony that it was difficult to explain how Damyanidu and Lawless did not want her working at the Bank because of her age, particularly because, she now claims in her affidavit that, "Damyanidu was very clever and would use non-verbal cues to indicate when she did not approve of someone's appearance or did not like them in general."[148] In any event, both statements consist of conclusory allegations that only provide a reasonable jury with matters of conjecture.

Therefore, the Court grants summary judgment against Barbini's claims for age discrimination against Defendants under ADEA and the NYSHRL.

---

[146] (Barbini Dep. Tr. at 85:2–25.)

[147] (Barbini Aff. ¶ 33.)

[148] (*Id.* ¶ 26.)

42

**IV.     Retaliation**

*A.     Legal Standards*

Title VII, the ADEA, and the NYSHRL protect "the filing of formal charges of discrimination . . . as well informal protests of discriminatory employment practices." *Littlejohn v. City of New York*, 795 F.3d 297, 317 (2d Cir. 2015) (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)).   To make out a *prima facie* case of retaliation, plaintiff must establish "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (internal quotation marks omitted). "Protected activity is action taken to protest or oppose statutorily prohibited discrimination."  *Natofsky v. City of New York*, 921 F.3d 337, 354 (2d Cir. 2019) (quotation marks omitted). Courts also apply the *McDonnell Douglas* burden shifting analysis in retaliation claims asserted under Title VII, the ADEA, and NYSHRL. *See Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996); *Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000).

*B.     Application*

1.     <u>Plaintiffs' Retaliation Claims for Opposing Sexual Harassment</u>

Defendants contend that Plaintiffs cannot establish a *prima facie* case of retaliation for opposing sexual harassment. (Mot. at 31–32.) Defendants do not dispute that Henry's sexual harassment complaint against Lawless constitutes protected activity, that the Bank knew about it, and that Plaintiffs termination was an adverse employment action. (*Id.*) Yet, Defendants dispute that (1) Barbini engaged in a protected activity as it was Henry who called the Bank's ethics hotline; and (2) there is no causal connection between Henry's sexual harassment complaint and Plaintiffs' termination because the Bank terminated them for violating the Notary Policy. (*Id.*)

In opposition, Plaintiffs contend that Barbini did participate in a protected activity because she allegedly met and complained about Lawless's sexual harassment with Lawless and Damyanidu separately. (Resp. in Opp'n at 33.) Additionally, Plaintiffs argue that the temporal proximity between Henry's sexual harassment complaint and their termination, together with the existing dispute of material fact regarding the existence of the zero-tolerance policy for violations of the Notary Policy, precludes summary judgment against their retaliation claims for opposing sexual harassment. (*Id.* at 33–35.)

After due consideration, the Court concludes that a material dispute of fact precludes summary judgment against their retaliation claims for opposing sexual harassment.

First, contrary to Defendants' assertion, Barbini's conduct in aiding Henry with her sexual harassment complaint against Lawless constitutes a protected activity. "[A]ctivities protected under Title VII and NYSHRL fall into two broad categories: (1) opposing any practice made an unlawful employment practice by Title VII or the NYSHRL (an "opposition claim") or (2) making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding or hearing under Title VII or the NYSHRL (a "participation claim")." *Rice v. Smithtown Volkswagen*, 321 F. Supp. 3d 375, 389 (E.D.N.Y. 2018) (emphasis and citations omitted). "The law is clear that informal complaints to management about discriminatory activity fall within the 'opposition' component of the protected activity element." *Id.* (citing *Littlejohn v. City of New York*, 795 F.3d 297, 318–19 (2d Cir. 2018)); *see also Falcon v. City Univ. of New York*, 263 F. Supp. 3d 416, 418–19 (E.D.N.Y. 2017) ("The law also does not require that the employee file a formal complaint when opposing the discriminatory practices—an informal complaint is sufficient.").

Notably, employees who are required by their job duties to report or investigate other employees' complaints of discrimination are not generally engaging in protected activity "because

merely to convey others' complaints of discrimination is not to oppose practices made unlawful by Title VII." *Littlejohn*, 795 F.3d at 318. "But if an employee—even one whose job responsibilities involve investigating complaints of discrimination—actively 'support[s]' other employees in asserting their Title VII rights or personally 'complain[s]' or is 'critical' about the 'discriminatory employment practices' of her employer, that employee has engaged in a protected activity[.]" *Id.* (alternations in original) (citations omitted).

Here, the parties do not dispute that Barbini did more than refer Henry to the Bank's ethics hotline to report Lawless. Upon Henry's request, Barbini was present for both, the meeting with Damyanidu on the Monday following the text message incident, and during Henry's interview with McMichael, to actively support Henry in asserting a sexual harassment complaint.[149] Thus, Barbini's active support for Henry during her two meetings with Defendants constitute protected activity for purposes of Plaintiffs' retaliation claims for opposing sexual harassment.

Second, for purposes of establishing a *prima facie* case, the Court agrees with Plaintiffs that the record contains sufficient evidence of a causal connection between their protected activity and termination. The record does show a temporal proximity between Plaintiffs' participation in Henry's sexual harassment complaint (August 14 and 17, 2015) and their termination (September 9, 2015).[150] *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (noting that "[t]he temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a *prima facie* case of retaliation under Title VII[.]").

And third, while Defendants aver that the Bank terminated Plaintiffs for a legitimate, non-discriminatory reason (*i.e.*, for violating the Notary Policy), the Court is of the view that the record

---

[149] (Defs.' SUMF ¶¶ 49, 54; Pls.' CSUMF ¶¶ 49, 54.; Damyanidu Dep. Tr. at 71:21–72:8.)

[150] (Defs.' SUMF ¶¶ 199, 122; Pls. CSUMF ¶¶ 199, 122.)

contains additional evidence other than temporal proximity from which a reasonable jury could conclude that the Bank's proffered reason is pretext. For one thing, as already noted above, there is a material dispute of fact concerning the existence of the zero-tolerance policy towards those employees who violated the Notary Policy. *See* Part III, A, 1, *supra*. Such dispute by itself precludes summary judgment because the Court is unable to make credibility determinations at the summary judgment stage. *Id.*

But further, even when assuming that the zero-tolerance policy in fact exists, the record shows that after Barbini reported to Damyanidu that Lawless asked her to notarize documents in violation of the Notary Policy, Fee only interviewed Barbini and Henry during the subsequent investigation despite there being other notaries working under Lawless's supervision.[151] Indeed, the parties do not dispute that (1) Lawless managed two of the Bank branches, each with multiple notaries;[152] (2) Lawless testified about how he maintained the notary practices of the last branch manager;[153] and (3) Robustelli and Lawless both instructed Henry and Barbini, respectively, to notarize documents without the customer being present.[154] From these facts, a reasonable jury could infer that Plaintiffs could not have been the only notaries who were instructed to violate the Notary Policy. A reasonable jury could also find that Fee's investigation into the notary practices of the two branches was not impartial because it solely targeted Barbini and Henry—the two same employees who participated in a sexual harassment complaint against Lawless.

Therefore, the Court denies summary judgment against Plaintiffs' retaliation claims for opposing sexual harassment under Title VII and the NYSHRL.

---

[151] (Fee. Dep. Tr. 31:2–5; Lawless Dep. Tr. 109:3–20; Joint Pls.' Counsel Affs., Ex. C.)

[152]  (Defs.' SUMF ¶ 3; Pls. CSUMF ¶ 3.)

[153] (Lawless Dep. Tr.  at 129:11–131:3.)

[154] (Joint Pls.' Counsel Affs., Ex. AA.)

2.      Barbini's ADEA Retaliation Claim for Opposing Age Discrimination

Defendants appear to contend that Barbini cannot establish a *prima facie* case of retaliation for opposing age discrimination because she fails to establish all but one element—the adverse employment action. (Mot. at 30–32.) They indicate that Barbini never engaged in any protected activity because she never made any formal or informal complaint about Damyanidu and Lawless's alleged age discrimination against her. (*Id.* at 31.) Defendants also aver that Barbini fails to establish any causal connection between any purported protected activity and her termination because she was terminated for a violation of the Notary Policy and not due to her age. (*Id.* at 31–32.)

In opposition, Barbini contends that she did participate in a protected activity when she allegedly met with Damyanidu and Lawless separately to complaint about their treatment towards her based on her age. (Resp. in Opp'n at 33–34.) Barbini also argues that not only is there a temporal proximity between her termination and her meeting with Damyanidu during which she requested her retirement package, but that the record shows she was subjected to an ongoing and continuing course of age discrimination that culminated in her termination. (*Id.* at 34–35.)

But after thoroughly reviewing the record, the Court concludes that Barbini fails to establish a *prima facie* case for her retaliation claims for opposing age discrimination, particularly because even when viewing the evidence in Barbini's favor, nowhere in the record is there any reference about her reporting any alleged age discrimination.

Barbini admits that she never raised any alleged age discrimination with HR because she purportedly did not trust the department.[155] Yet, she nonetheless avers that she met with Damyanidu and Lawless separately and complained specifically about their treatment towards her

---

[155] (Defs.' SUMF ¶ 143; Pls.' CSUMF ¶ 143.)

based on her age.[156] However, the record shows that Barbini proffers inconsistent statements on these matters and that she continues to rely on her subjective impressions and conclusory allegations in attempting to raise an issue of fact.

Barbini asserts that the two meetings to which she refers include: (1) the May 1, 2015 meeting with Lawless, during which she complained about his comment that "if it were up to [him], [he] would take [her] to the shed"; and (2) the August 21, 2015 meeting with Damyanidu— the same meeting during which she initially brought up how Lawless instructed her to notarize documents outside the presence of customers. (Resp. in Opp'n at 35.)

Regarding her meeting with Lawless, Barbini testified that on May 1, 2015, she emailed Lawless to request an individual meeting with him because she was embarrassed by his reprimand the day before.[157] Lawless wanted Barbini to "ignore the customers" from 10:00 a.m. to 11:00 a.m. so she could make more cold calls to customers and increase sales.[158] Barbini represented that she made the cold calls as instructed, but that she also had to stop whenever she saw customers waiting at the bank.[159] For that reason, Lawless reprimanded her for being insubordinate in front of other co-workers and told her that "if he had his way, he [would] take [her] to the shed."[160] Barbini requested the May 1st meeting because she wanted to know why Lawless treated her like that in

---

[156] (Barbini Aff. ¶¶ 32, 58–59.)

[157] (Barbini Dep. Tr. at 82:25–83:25.)

[158] (*Id.* at 80:23–81:17.)

[159] (*Id.*)

[160] (*Id.* at 83:9–25.)

front of others and was so ruthless as she did not deserve it.[161] At the meeting, Lawless told Barbini

that he stood by everything he said, and that "if he had his way, he would taker [her] to the shed."[162]

As the Court already noted above in granting summary judgment against Barbini's age

discrimination claims, even when drawing all inferences in favor of Barbini, the record lacks any

evidence from which a reasonable jury could conclude that Lawless's comments were motivated

by age discrimination against Barbini. Moreover, Barbini points to no evidence from which a

reasonable jury could even infer that she was complaining about age discrimination to Lawless.

The record only shows that she testified that she was embarrassed for being reprimanded in front

of other employees and that she thought she did not deserve such harsh reprimand. Without more,

Barbini's allegations that she complained to Lawless about age discrimination during the May 1,

2015 meeting are conclusory and insufficient to raise an issue of fact.

Likewise, Barbini's allegations about her August 21, 2016 meeting with Damyanidu fail

for similar reasons. After Barbini testified how she reported to Damyanidu that Lawless was asking

her to notarize documents without the signatory customers present, Defendants' counsel asked

Barbini if she recalled saying anything else to Damyanidu during that conversation.[163] Barbini

responded: "I think I told her, I know you don't really want me on your team, just give me a

package and I leave."[164] But upon further questioning by Defendants' counsel regarding whether

Barbini ever told Damyanidu that she felt discriminated against or said words to that effect, Barbini

testified that she felt intimidated by Damyanidu and admitted that she never told Damyanidu about

---

[161] (*Id.* at 84:11–17.)

[162] (*Id.* at 84:23–85:2.)

[163] (*Id.* at 145:8–11.)

[164] (*Id.* at 145:12–14.)

how she felt she was being treated unfairly in any way.[165] As such, even when drawing all inferences in favor in Barbini's favor, the Court is of the view that Barbini fails to adduce any evidence upon which a reasonable jury may infer that she specifically complained about age discrimination to Damyanidu.

To be sure, Barbini also claims in her affidavit—submitted two years after her deposition testimony—that she told Damyanidu during the same meeting, in sum or substance, that she knew Damyanidu did not want her there and "was looking to replace her with one of her younger friends," among other things.[166] However, the Court need not consider these claims in the affidavit because they are both inconsistent with Barbini's relevant deposition testimony and also represent Barbini's subjective impressions and speculation of what she believes she told Damyanidu. *See Gorzynski*, 596 F.3d at 104; *Conroy*, 333 F.3d at 94.

Because Barbini fails to establish the first element of a *prima facie* case of her retaliation claims for opposing age discrimination, the Court grants summary judgment against such claims. *See O'Connor*, 517 U.S. at 311–12.

## V.     Barbini's Hostile Work Environment Claims Based on Age Discrimination

### A.     Legal Standards

The standards for evaluating hostile work environment claims are identical under Title VII, the ADEA, and the NYSHRL. *See Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d Cir. 2011). To prevail on a hostile work environment claim, plaintiffs must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create

---

[165] (*Id.* at 147:13–149:12.)

[166] (Barbini Aff. ¶¶ 53, 58–59.)

an abusive working environment." *Littlejohn*, 795 F.3d at 320–21 (citations omitted). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Id.* at 321. Significantly, the conduct that creates a hostile work environment must be motivated by the plaintiff's protected characteristic. *See Brown*, 257 F.3d at 252 ("It is axiomatic that mistreatment at work . . . through subjection to a hostile work environment . . . is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic.").

Courts assess a work environment's hostility based on the totality of the circumstances. *See Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (citations omitted). In assessing the totality of the circumstances, courts may consider the following factors: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *Id.* Generally, to constitute a hostile work environment, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013). Isolated acts, "unless very serious, do not meet the threshold of severity or pervasiveness." *Id.* (citations omitted).

### B.   Application

Defendants contend that Barbini's hostile work environment claims based on her age fails because there is no evidence of Defendants' hostility towards Barbini based on her age. (Mot. at 35.) They also contend that even if the challenged conduct Barbini avers was in fact "hostile" or "abusive", her claims still fail because the conduct does not qualify as sufficiently severe or pervasive and, at best, consists of an isolated incident. (*Id.*)

In opposition, Barbini argues that there is sufficient evidence that Defendants subjected her to a hostile work environment based on her age.[167] She claims that Damyanidu and Lawless subjected her to harassment that was severe and went for almost a year. (Resp. in Opp'n at 36.) She also claims that she endured "months of torment" after both Damyanidu and Lawless undermined her position, threatened her job, subjected her to insulting comments, and falsely accused her of misconduct. (*Id.* at 36–37.)

After due consideration, the Court concludes that even when drawing all inferences in favor of Barbini, the record contains no evidence from which a reasonable jury could conclude that she was subjected to a hostile work environment based on her age.

First, Barbini fails to identify the purported series of "continuous and concerted events" which support her hostile work environment claim. Instead, she merely provides the conclusory allegation that "Defendants subjected [her] to months of torment by undermining her position, threatening her job, subjecting her to insulting comments, and falsely accusing her of misconduct" and cites generally to her handwritten notes and the affidavit she submitted in opposing summary judgment as support. (*See* Resp. in Opp'n at 37.)

And second, to the extent Barbini argues that the same interactions with Damyanidu and Lawless she claimed showed age discrimination also support her hostile work environment claims,

---

[167] The Court notes that both parties in their respective briefs mention in passing that both Henry and Barbini assert claims for hostile work environment based on gender. (*See, e.g.*, Mot. at 26 (arguing against *Plaintiffs* purported hostile work environment claim based on gender); Resp. in Opp'n at 36–37 (arguing in favor of Barbini's hostile work environment claim based on age but titling section "PLAINTIFFS WERE SUBJECTED TO A HOSTILE WORK ENVIRONMENT"); *see also id.* at 37 ("Here, there is clearly sufficient evidence that the Defendants subjected Plaintiff Barbini to a hostile work environment based on her age *and gender*." (emphasis added)).

As previously discussed, Plaintiffs' counsel represented at the January 24, 2020 premotion conference that there were only fourteen causes of action in this case after they withdrew six of them. Based on the substance of parties' briefing, particularly Plaintiffs' failure to argue against summary judgment on the hostile work environment claims based on gender, the Court construes that such claims were not among the fourteen causes of action asserted. But even if the Court were to address such claims—assuming *arguendo* that Plaintiffs properly exhausted them, a review of the record fails to reveal any evidence of any discriminatory intimidation, ridicule, and insult towards Plaintiffs based on their gender that is sufficiently severe or pervasive.

she fails to persuade the Court. As already discussed, the record contains no evidence from which a reasonable jury could conclude that Damyanidu or Lawless acted with age-based discriminatory animus—much less that the "workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [her] employment." *Harris*, 510 U.S. at 21; *cf. Preuss v. Kolmar Laboratories, Inc.*, 970 F. Supp. 2d 171, 185 (S.D.N.Y. 2013) (denying summary judgment against hostile work environment claim because record showed supervisor harassed plaintiff based on his age on a daily-basis by calling plaintiff "old man", asking him when he was going to retire so he could be replaced with "young blood", yelling at him "useless, worthless, [and] incompetent," and saying he hoped the swine flu virus got rid of the "old timers" at work.)

Therefore, the Court grants summary judgment against Barbini's claims for hostile work environment based on age discrimination under ADEA and the NYSHRL.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part, DENIED in part. Defendants' motion is GRANTED as to (1) Barbini's claim for discrimination based on gender under Title VII; (2) Barbini's claims for discrimination based on age under the ADEA and the NYSHRL; (3) Barbini's retaliation claims for opposing age discrimination under the ADEA and the NYSHRL; and (4) Barbini's hostile work environment claims under the ADEA and the NYSHRL. Defendants' motion is DENIED as to (1) Henry's claims for discrimination based on gender under Title VII and the NYSHRL; (2) Barbini's claim for discrimination based on gender under the NYSHRL; and (3) Plaintiffs' claims for retaliation for opposing sexual harassment under Title VII and the NYSHRL. The parties are directed to appear for a telephonic pre-trial conference on March 4, 2022, at 2:00 p.m. To access the telephonic pre-trial conference, please follow these instructions: (1) Dial the meeting number: (877) 336-

1839; (2) enter the Access Code: 1231334#; (3) press pound (#) to enter the conference as a guest.

The Clerk of Court is directed to terminate the motion at ECF No. 139.

Dated:  March 3, 2022
   White Plains, NY

SO ORDERED:

_____

NELSON S. ROMÁN
United States District Judge